**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE**

|  |  |
|---|---|
| BYD (H.K.) CO., LTD.,<br> *Plaintiff,*<br><br>and<br><br>FLORIDA POWER & LIGHT<br>COMPANY,<br> *Plaintiff-Intervenor,*<br><br>v.<br><br>UNITED STATES,<br> *Defendant,*<br><br>and<br><br>AUXIN SOLAR INC.,<br> *Defendant-Intervenor.* | Ct. No. 23-00221 |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY**
**RECORD PURSUANT TO RULE 56.2**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of

International Trade, Plaintiff BYD (H.K.) Co., Ltd. moves for judgment

on the agency record with respect to its complaint challenging the final

determination of the U.S. Department of Commerce's ("Commerce")

circumvention inquiry, published in *Antidumping and Countervailing*

*Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not*

*Assembled Into Modules, from the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23, 2023), P.R. 525, Appx1364–78 and accompanying Memorandum from James Maeder to Lisa Wang, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia*, Case Nos. A-570-979/C-570-980 (Circumvention Inquiry–Cambodia 2022) (Aug. 17, 2023), P.R. 522, Appx1196–1363; Memorandum from Commerce to the File, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, Final Analysis Memorandum for BYD (H.K.) Co., Ltd.*, Case Nos. A-570-979/C-570-980 (Circumvention Inquiry–Cambodia 2022) (Aug. 17, 2023) ("*BYD HK Final Analysis Mem.*"), C.R. 268, Appx1192–1195.

For the reasons explained in the accompanying Memorandum, Plaintiff respectively moves this Court hold that the contested portions

of the *Final Determination* are unsupported by substantial evidence and otherwise not in accordance with law, pursuant to Rule 56.2. Plaintiff further moves for this Court to remand this matter to Commerce for disposition consistent with the order and opinion of this Court.

Respectfully submitted,

/s/    Craig A. Lewis

Craig A. Lewis
Nicholas W. Laneville
Gregory M.A. Hawkins

**HOGAN LOVELLS US LLP**
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600

*Counsel to BYD (HK) Co., Ltd.*

Dated:  July 2, 2024

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

BYD (H.K.) CO., LTD.,
    *Plaintiff,*

and

FLORIDA POWER & LIGHT
COMPANY,
    *Plaintiff-Intervenor,*

v.                                                          Ct. No. 23-00221

UNITED STATES,
    *Defendant,*

and

AUXIN SOLAR INC.,
    *Defendant-Intervenor.*

## PUBLIC MEMORANDUM IN SUPPORT OF
## MOTION FOR JUDGMENT ON THE AGENCY RECORD OF
## PLAINTIFF BYD (H.K.) CO., LTD.

Craig A. Lewis
Nicholas W. Laneville
Gregory M.A. Hawkins

**HOGAN LOVELLS US LLP**
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600

Dated: July 2, 2024                    *Counsel to BYD (HK) Co., Ltd.*

# TABLE OF CONTENTS

I.  RULE 56.2 STATEMENT AND SUMMARY OF THE
    ARGUMENT ........................................................................ 1

    A.  Administrative Determination Sought to be Reviewed ......... 1

    B.  Issues Presented and Summary of the Argument ................. 3

II.  STATEMENT OF FACTS .................................................... 8

III.  STANDARD OF REVIEW .................................................. 22

IV.  ARGUMENT .................................................................. 27

    A.  Commerce Misapplied the Statutory "Minor or Insignificant"
        Standard ................................................................... 30

    B.  Commerce Erred by Ignoring the Activities of the Tollers in
        Cambodia .................................................................. 39

        1.  Commerce's Analysis Unlawfully Ignored the
            Cambodian Toll Processors' Substantial Investments
            and Production Facilities ......................................... 41

        2.  The Investments and Production Facilities in
            Cambodia Are Not "Minor or Insignificant" ............... 44

    C.  Commerce's Value-Added Analysis Was Flawed ................. 47

        1.  Commerce Relied Upon an Impermissible
            Interpretation of the Statute .................................... 48

        2.  Commerce Failed to Conduct the Required Qualitative
            Value-Added Analysis ............................................. 51

    D.  Commerce Assigned Undue Weight to the R&D Factor,
        Which Distorted its Analysis ......................................... 56

    E.  Commerce's Analysis of Investment Data on an Absolute
        Basis was Distortive and Unlawful ................................. 59

    F.  Commerce Improperly Used Surrogate Values to Value
        Chinese Inputs Consumed in Cambodia ........................... 63

    G.  Commerce Failed to Demonstrate that an Affirmative
        Finding of Circumvention Is "Appropriate" within the
        Meaning of the Statute ................................................ 69

V.    CONCLUSION ..................................................................................75

# TABLE OF AUTHORITIES

## CASES

*Al Ghurair Iron & Steel LLC v. United States,*
    536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021)......................................66

*Anhydrides & Chemicals, Inc. v. United States,*
    130 F.3d 1481 (Fed. Cir. 1997) ...........................................................26

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ..........................................................24

*Best Power Tech. Sales Corp. v. Austin,*
    984 F.2d 1172 (Fed. Cir. 1993) ..........................................................33

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962)..............................................................................23

*Chevron, U.S.A., Inc. v. N.R.D.C, Inc,*
    467 U.S. 837 (1984)......................................................................24, 25

*Consol. Edison Co. v. N.L.R.B.,*
    305 U.S. 197 (1938)..............................................................................22

*Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Technical, Salaried
    & Mach. Workers, AFL-CIO,*
    6 F.3d 1511 (Fed. Cir. 1993) ..............................................................23

*Gallant Ocean (Thailand) Co. v. United States,*
    602 F.3d 1319 (Fed. Cir. 2010) ..........................................................22

*Huaiyin Foreign Trade Corp. v. United States,*
    322 F.3d 1369 (Fed. Cir. 2003) ..........................................................24

*Int'l Bus. Machs. Corp. v. United States,*
    201 F.3d 1367 (Fed. Cir. 2000) ..........................................................33

*JBLU, Inc. v. United States,*
    813 F.3d 1377 (Fed. Cir. 2016) ..........................................................27

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019)..........................................................................27

*Loper Bright Enterprises et al. v. Raimondo,*
    603 U.S. __ (2024) ....................................................................... *passim*

*Michigan v. EPA,*
    576 U.S. 743 (2015)...................................................................72

*Montclair v. Ramsdell,*
    107 U.S. 147 (1883)...................................................................71

*N.L.R.B. v. Columbian Enameling & Stamping Co.,*
    306 U.S. 292 (1939)...................................................................22

*NMB Sing. Ltd.* v. *United States,*
    557 F.3d 1316 (Fed. Cir. 2009) ...............................................23

*Nucor Corporation v. United States,*
    461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020)...........................23

*Pesquera Mares Australes v. United States,*
    266 F.3d 1372 (Fed. Cir. 2001) .........................................26, 32

*Stein Industries Inc. v. United States,*
    365 F. Supp. 3d 1364 (Ct. Int'l Trade 2019)...........................23

*Timex V.I., Inc. v. United States,*
    157 F.3d 879 (Fed. Cir. 1998) .................................................26

*United States v. Menasche,*
    348 U.S. 528 (1955)...................................................................71

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) .......................................................22

19 U.S.C. § 1677b(f)......................................................................65

19 U.S.C. § 1677f(i)(3)(A) .............................................................23

19 U.S.C. § 1677j(b)...........................................................*passim*

## OTHER AUTHORITIES

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China; Preliminary Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam,*
    87 Fed. Reg. 75,221 (Dep't Commerce Dec. 8, 2022)............18

*Certain Aluminum Foil from the People's Republic of China,*
    88 Fed. Reg. 17,177 (Dep't Commerce Mar. 22, 2023) ..........59

*Certain Cold-Rolled Steel Flat Products from the People's Republic of China*,
83 Fed. Reg. 23,891 (Dep't Commerce May 23, 2018).........................60

*Certain Pasta from Italy*,
68 Fed. Reg. 46,571 (Dep't Commerce Aug. 6, 2003) ..........................52

*Certain Pasta from Italy*,
68 Fed. Reg. 54,888 (Dep't Commerce Sept. 19, 2003) .......................52

*Certain Tissue Paper Products from the People's Republic of China*,
73 Fed. Reg. 21,580 (Dep't Commerce Apr. 22, 2008).........................50

*Certain Walk-Behind Lawn Mowers and Parts Thereof From the People's Republic of China*,
88 Fed. Reg. 13,434 (Dep't Commerce Mar. 3, 2023)..........................73

*Certain Welded Carbon Steel Standard Pipes and Tubes from India*,
87 Fed. Reg. 52,507 (Dep't Commerce Aug. 26, 2022) ........................58

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*,
87 Fed. Reg. 19,071 (Dep't Commerce Apr. 1, 2022)..........................10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*,
77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012)............................8

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Countervailing Duty Order*,
77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012)............................9

*Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules From Southeast Asia*,
87 Fed. Reg. 35,067 (Executive Office of the President June 9, 2022)
.................................................................................17, 72

*Ferrovanadium and Nitrided Vanadium From the Russian Federation*,
  77 Fed. Reg. 6,537 (Dep't Commerce Feb. 8, 2012) ............................ 49

*Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany
  and the UK*,
  64 Fed. Reg. 40,336 (Dep't Commerce Jul. 26, 1999) ......................... 49

*Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany
  and the United Kingdom*,
  64 Fed. Reg. 40,336 (Dep't Commerce July 26, 1999) ........................ 52

*Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan*,
  88 Fed. Reg. 21,980 (Dep't Commerce Apr. 12, 2023) ........................ 58

*Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab
  Emirates*,
  80 Fed. Reg. 26,229 (Dep't Commerce May 7, 2015) ........................... 51

*Procedures Covering Suspension of Liquidation, Duties and Estimated
  Duties in Accord With Presidential Proclamation 10414*,
  87 Fed. Reg. 56,868 (Dep't Commerce Sept. 16, 2022) ....................... 17

Small Diameter Graphic Electrodes from the People's Republic of
  China,
  77 Fed. Reg. 33,405 (Dep't Commerce June 6, 2012) ......................... 52

*Stainless Steel Sheet and Strip from the People's Republic of China:
  Scope and Circumvention Inquiries Covering Exports from the
  Socialist Republic of Vietnam; Preliminary Scope and Circumvention
  Determinations*,
  87 Fed. Reg. 56,626 (Dep't Commerce Sept. 15, 2022) ....................... 43

Uruguay Round Agreements Act, Statement of Administrative Action,
  H.R. Rep. No. 103-316 (1994) ............................................. 34, 53, 57, 60

# GLOSSARY

| Abbreviations | Term |
|---|---|
| AD/CVD | Antidumping and Countervailing Duty |
| A-SMACC | American Solar Manufacturers Against Chinese Circumvention |
| Auxin | Auxin Solar Inc. |
| Auxin Circ. Req. | Letter from Cassidy Levy Kent (USA) LLP to the U.S. Department of Commerce, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From The People's Republic Of China, *Auxin Solar Placing Petition on Record*, Case Nos. A-570-979, C-570-980 (Anti-Circumvention Inquiry Concerning Malaysia, Vietnam, and Thailand) (Feb. 18, 2022) |
| *BYD HK Prelim. Analysis Mem.* | Memorandum from Jose Rivera to The File, *Crystalline Silicone Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China – Circumvention Inquiry with Respect to Cambodia: Preliminary Analysis Memorandum for BYD (H.K.) Co., Ltd.*, Case No. A-570-979 (Circumvention Inquiry–Cambodia 2022) (Dec. 1, 2022) |
| *BYD HK Final Analysis Mem.* | Memorandum from Commerce to the File, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, Final Analysis Memorandum for BYD (H.K.) Co., Ltd.*, Case |

| Abbreviations | Term |
|---|---|
| | Nos. A-570-979/C-570-980 (Circumvention Inquiry–Cambodia 2022) (Aug. 17, 2023) |
| CSPV | Crystalline Silicon Photovoltaic |
| *Final Determination* | *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23, 2023) |
| *Final IDM* | Memorandum from James Maeder to Lisa Wang, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, Issues and Decision Memorandum for the Circumvention Inquiry With Respect to Cambodia*, Case Nos. A-570-979/C-570-980 (Circumvention Inquiry–Cambodia 2022) (Aug. 17, 2023) |
| "Minor or insignificant" Factors | Statutory factors under 19 U.S.C. § 1677j(b)(2) |
| NextEra Comments | *Letter from Akin Gump Strauss Hauer & Feld LLP to the Department, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: NextEra Comments on Auxin's Circumvention Ruling Request*, Case No. A- |

| Abbreviations | Term |
|---|---|
|  | 570-979 (Anti-circumvention Inquiries, Cambodia–2022, Malaysia–2022, Thailand–2022, Vietnam–2022) (May 2, 2022) |
| p/n junction | Positive-Negative Junction |
| *Prelim. Determination* | *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Affirmative Determinations if Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 Fed. Reg. 75,221 (Dep't Commerce Dec. 8, 2022) |
| *Prelim. IDM* | Memorandum from James Maeder to Lisa Wang, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Cambodia*, Case No. A-570-979 (Circumvention Inquiry Cambodia 2022) (Dec. 1, 2022) |
| Q&V | Quantity and Value |
| R&D | Research and Development |
| *Solar I Orders* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73018 (Dep't Commerce Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether* |

| Abbreviations | Term |
|---|---|
| | *or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Plaintiff BYD (HK) Co., Ltd. ("BYD HK") submits the following Memorandum of Points and Authorities in support of BYD HK's Motion for Judgment on the Agency Record in accordance with Rule 56.2 of the Rules of the United States Court of International Trade. Plaintiff moves for judgment on the agency record, in accordance with this Court's February 13, 2024 Order and subsequent amendments. ECF Nos. 28, 32, 35 (Ct. No. 23-221). For the reasons set forth below, BYD HK respectfully submits that the U.S. Department of Commerce's affirmative finding of circumvention with respect to BYD HK is neither supported by substantial evidence nor in accordance with law. BYD respectfully requests that the Court reverse the challenged determination and remand with instructions for Commerce to redetermine its circumvention finding with respect to BYD HK consistent with this Memorandum and the Court's findings.

## I.    RULE 56.2 STATEMENT AND SUMMARY OF THE ARGUMENT

### A.    Administrative Determination Sought to be Reviewed

BYD HK seeks review of the final affirmative circumvention determination of the U.S. Department of Commerce, International

1

Trade Administration ("Commerce"), notice of which was published on August 23, 2023 as *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23, 2023), P.R. 525, Appx1364–78 ("*Final Determination*") and accompanying Memorandum from James Maeder to Lisa Wang, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia*, Case Nos. A-570-979/C-570-980 (Circumvention Inquiry–Cambodia 2022) (Aug. 17, 2023), P.R. 522, Appx1196–1363 ("*Final IDM*"); Memorandum from Commerce to the File, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, Final Analysis Memorandum for BYD (H.K.) Co., Ltd.*, Case Nos. A-570-979/C-570-980 (Circumvention Inquiry–

Cambodia 2022) (Aug. 17, 2023), C.R. 268, Appx1192–1195 ("*BYD HK*

*Final Analysis Mem.*").

## B.    Issues Presented and Summary of the Argument

BYD HK seeks judgment on the agency record holding that the

*Final Determination* is unsupported by substantial evidence and

otherwise not in accordance with law. BYD HK respectfully moves that

this Court remand the *Final Determination* with instructions to issue a

new determination consistent with this Court's decision. BYD HK seeks

judgment on the agency record with respect to the following issues:

### 1.    Whether Commerce Correctly Applied the Statutory Standard for "Minor or Insignificant"

No. To reach an affirmative circumvention determination, the

statute requires that Commerce find the process of assembly or

completion in Cambodia to be "minor or insignificant." In the *Final*

*Determination*, by finding that a  process whose "nature" was conceded

to be significant and complex and that imparts [       ] percent of the

value of the finished solar modules is nevertheless "minor or

insignificant," Commerce has effectively interpreted the statutory

phrase of "minor or insignificant" as requiring operations in the inquiry

country to account for a *large* portion of the investment, value-added,

and processing required to manufacture the finished goods. Such an interpretation is at odds with the plain meaning of the statutory text and is unlawful.

**2.    Whether Commerce's failure to consider the activities of the Cambodian tollers in making its findings on the levels of investment and research and development ("R&D") and the extent of production facilities in Cambodia was supported by substantial evidence and otherwise in accordance with law.**

No. The statute directs Commerce to consider "the process of assembly or completion in the third country" and to determine if that processing performed in Cambodia is "minor or insignificant." The *ownership* of these facilities is not a factor that Congress directed Commerce to consider. Commerce unlawfully ignored record evidence addressing the investments and production facilities—two factors Commerce was required to assess under the statute—of the unaffiliated Cambodian tollers who were actually engaged in the processing operations in Cambodia.

3.    **Whether Commerce's finding that value-added exceeding [        ] of total value supported an affirmative circumvention finding was supported by substantial evidence and otherwise in accordance with law.**

No. Consistent with the plain meaning of the statute, Commerce cannot reasonably find that the value added from processing performed in Cambodia—**[        ]** percent of the value of the finished solar modules—represents a "small" proportion of the value of the merchandise imported into the United States. Commerce also failed to adhere to Congress's directive that the agency focus more on a qualitative analysis of the production processes undertaken in Cambodia (which Commerce admitted was significant) and less on a mechanical value-added calculation.

4.    **Whether Commerce's determinative treatment of R&D was permissible under the statute**

No. The statute requires Commerce to consider five factors in determining whether the process of assembly or completion in the foreign country is minor or insignificant. Yet Commerce claimed that R&D should be afforded "preeminent importance" and made its determinations across the *Final Determinations* in a manner so as to

effectively afford R&D determinative status. This unbalanced approach to the statutory analysis was unlawful.

### 5. Whether Commerce's analysis of investment data on an absolute basis was supported by substantial evidence and otherwise in accordance with law.

No. Congress instructed Commerce, in conducting its circumvention analysis, to evaluate factors such as investment depending on the record evidence of the specific case. Commerce elected to compare the level of investment in Cambodia to the level of investment of BYD HK's Chinese affiliates on an absolute basis (*i.e.*, the total value of investments made) rather than on a per-megawatt basis (*i.e.*, the value of the investments relative to production). Commerce did so despite significant record evidence demonstrating that such an approach would be highly distortive by ignoring the vastly smaller market served by the Cambodian operations as compared to BYD HK's Chinese affiliates. Commerce's approach was unreasonable and unsupported by the record evidence.

**6.     Whether Commerce's use of surrogate values to calculate the value added in Cambodia was supported by substantial evidence and otherwise in accordance with law**

No. Commerce has no statutory or factual basis for its departure from BYD HK's actual books and records, which are inherently more accurate than the use of surrogate values. BYD HK reported complete cost information for Chinese inputs that were consumed through the Cambodian manufacturing operation that reflected the actual purchase value of raw materials into the Cambodian market. Commerce's unsupported assertions that the actual purchase values in those books do not "reasonably reflect the costs associated with the production and sale of the merchandise" are insufficient to meets its burden to support its findings with substantial evidence—and renders its use of surrogate values unlawful.

**7.     Whether Commerce reasonably determined that an affirmative finding of circumvention is "appropriate" within the meaning of the statute.**

No. The statute directs Commerce to conduct analysis of whether application of the measures is "appropriate." The statute directs that this inquiry be taken separate and apart from Commerce's evaluation of the other statutory factors. In the *Final Determination*, Commerce

claims to have addressed this prong of the statute but merely restates its findings other under statutory factors. Commerce's circular reasoning misapplies the statutory analysis and ignores key record evidence demonstrating that an affirmative finding was not "appropriate," including that imposing an affirmative determination required Commerce to abandon its consistently held position regarding the scope of the *Solar I* Orders.

## II.    STATEMENT OF FACTS

On December 7, 2012, following affirmative injury determinations issued by the U.S. International Trade Commission ("USITC"), the U.S. Department of Commerce imposed antidumping duty ("AD") and countervailing duty ("CVD") orders on imports of solar cells and modules from China. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) ; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty*

*Order*, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012)  (collectively, "the *Solar I* Orders"). The scope of these orders on Chinese solar cells and modules has been clarified on multiple occasions as excluding any solar cells (or modules containing such cells) where the p/n junction was formed outside of China. *See*, *e.g.*, *Notice of Scope Rulings*, 86 Fed. Reg. 47,476 (Dep't Commerce Aug. 25, 2021). Commerce also indicated in its original *Solar I* investigation that converting Chinese-origin wafers into CSPV cells in a third country would not warrant a circumvention inquiry. Commerce stated instead that "Petitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country." *Letter from Akin Gump Strauss Hauer & Feld LLP to the Department, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: NextEra Comments on Auxin's Circumvention Ruling Request*, Case No. A-570-979 (Anti-circumvention Inquiries, Cambodia–2022, Malaysia–2022, Thailand–2022, Vietnam–2022) (May 2, 2022) ("NextEra Comments") at Att. 13, Memorandum from Jeff Pedersen to Gary Taverman, *Scope Clarification: Antidumping and Countervailing Duty Investigations of*

9

*Crystalline Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, Inv. Nos. A-570-979 and C-570-980 (Investigations) (Mar. 19, 2012) at 9, P.R. 158, Appx13235–13246.

On April 1, 2022, Commerce initiated country-wide circumvention inquiries to determine whether imports of CSPV solar cells and modules completed in Cambodia, Malaysia, Thailand, or Vietnam using parts and components from China were circumventing the *Solar I* Orders. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 19,071 (Dep't Commerce Apr. 1, 2022) (initiation of circumvention inquiry on the antidumping duty and countervailing duty orders). Commerce initiated the inquiry following a February 8, 2022, request by Auxin Solar Inc. ("Auxin"), a small domestic CSPV module assembler.

Commerce initiated and conducted this circumvention inquiry notwithstanding strong objections from respondents (maintained throughout the proceeding) that the inquiry contradicted long-established rulings by both Commerce and other agencies concerning the processing of solar cells. In particular, respondents objected that Commerce (and other U.S. government agencies) have consistently

found that the formation of a positive-negative ("p/n") junction on a polysilicon wafer is the critical process that establishes the essential character of a solar cell and module, and the location where the p/n junction is formed therefore establishes the country of origin of the cell and module for various trade and trade remedy purposes. Respondents argued that it would be inherently contradictory and legally impermissible for Commerce to find that the same "critical" processes are also "minor or insignificant" for purposes of the circumvention statute.

On April 22, 2022, BYD reported (at the first available opportunity) its use of toll manufacturers in Cambodia to Commerce in its Quantity and Value Questionnaire Response. C.R. 31, Appx3710–3723, and submitted quantity and value data from these unrelated producers for Commerce's assessment in respondent selection.

On May 12, 2022, Commerce selected BYD HK and New East Solar (Cambodia) Co., Ltd. as "mandatory respondents" subject to individual examination in Commerce's circumvention inquiry. *See* Memorandum from James Maeder to Lisa W. Wang, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells,*

*Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia*, Case No. A-570-979 (Anti-circumvention Inquiry, Cambodia–2022) (Dec. 1, 2022), P.R. 423, Appx1015–40 ("*Prelim. IDM*") at 2, Appx1016. Commerce issued circumvention questionnaires to both selected companies. *Id.*

BYD HK is a trading agent registered in Hong Kong and is fully owned by BYD Company Limited, a manufacturing conglomerate. Memorandum from Commerce to the File, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic from China – Circumvention Inquiry with Respect to Cambodia: Preliminary Analysis Memorandum for BYD (H.K.) Co., Ltd.*, Case No. A-570-979 (Circumvention Inquiry Cambodia 2022) (Dec. 1, 2022) ("*BYD HK Prelim. Analysis Mem.*") at 3, Appx1002. During 2021, BYD HK contracted with certain unaffiliated toll processors in Cambodia to manufacture solar products in Cambodia on its behalf for export to the United States. *Id.* BYD HK contracted with three unaffiliated toll processors for this purpose. *Id.* These unaffiliated Cambodian processors made significant investments and operated

substantial facilities and manufacturing lines in Cambodia, with a

combined capacity of approximately of **[                    ]**. *Id.* at 4, Appx1003.

Pursuant to an arrangement with BYD HK, the toll processors would

take raw materials, including wafers supplied by BYD HK's affiliated

wafer supplier BYD (Shangluo) Industrial Co., Ltd. ("Shangluo BYD"),

and transform them first into functioning solar cells, and then into solar

modules, for BYD HK to eventually export and sell. *Prelim. IDM,*

Appx1028. The startup costs for BYD HK's Cambodian tollers were in

excess of $**[                ]** U.S. Dollars ("USD"). *BYD HK Prelim. Analysis*

*Mem.* at 3, C.R. 185, Appx1002. Substantial machinery, equipment, and

manufacturing facilities were deployed to this end. *Final IDM* at 34,

Appx1229.

　　This Cambodian processing included transforming polysilicon

wafers into functioning solar cells by creating p/n junctions on the

cells—a complex, multi-step process that involved considerable capital

investments in specialized plants, equipment, and skilled labor. Id. at

34–36, Appx1229–1231. These Cambodian solar cells were then further

processed into functioning finished solar modules through a further

multi-step process that utilized additional machinery, equipment, and

inputs. *Id*. Commerce described this processing, contrasting it with the processing required in earlier stages and performed outside of Cambodia to make polysilicon ingots and wafers:

> {R}elative to ingot and wafer production, solar cell and module production involves a greater number of stages, each requiring a high level of technological sophistication. Specifically, the process for turning wafers into solar cells requires an expensive, multi-stage assembly line requiring high-technological machinery and workers with strong technological knowledge. While ingot and wafer production require large amounts of upfront capital and technical capabilities, the ITC found solar cell production to be the "most capital intensive part of the manufacturing process," and "a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees."
>
> Moreover, module production also involves a large number of varied inputs consumed in a complex, multi-step production process that requires precision, highly skilled workers, and accurate quality-testing equipment at multiple stages. Furthermore, the physical transformation of polysilicon rocks into wafers (*i.e.*, the portion of the production process occurring in China) is less extensive than the transformation of wafers into solar modules (*i.e.*, the portion of the production

14

process occurring in third countries). Only a
handful of inputs are used to convert polysilicon
rocks into wafers, whereas converting a solar cell
into a solar module requires approximately 100
different inputs.

Additionally, Commerce previously noted that
cell production is where the essence of a solar
module is realized. Specifically, Commerce noted
that: once a wafer is doped and an opposite
electrical orientation is imparted on the surface,
it results in the creation of a p/n junction. . .

*Prelim. IDM* at 17–18, Appx1031–32.

BYD HK fully cooperated as a mandatory respondent throughout

the course of the circumvention proceeding. BYD HK timely and

completely responded to Commerce's numerous questionnaires and

requests for information issued between March 2022 and January 2023.

BYD supplied Commerce with extensive data and documentation from

the unaffiliated Cambodian toll-processors demonstrating that they had

substantial investments in plants and equipment, conducted complex

and sophisticated processing in Cambodia, and added substantial value

to the exported products (accounting for more than **[          ]** of the

value of the solar modules that BYD exported from Cambodia). *BYD HK*

*Prelim. Analysis Mem.* at 3, Appx1002; *BYD HK Final Analysis Mem.* at 2, Appx1193. *See also Final IDM* at 50–52, Appx1245–1247.

Commerce thereafter conducted on-site verification of BYD HK's submissions from February 6, through February 9, 2023. Commerce found no significant discrepancies between BYD HK's reported information and the information presented at verification. Memorandum from Jose Rivera to The File, *Verification of the Questionnaire Responses of BYD (H.K.) Co., Ltd. in the Circumvention Inquiry of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - with Respect to Cambodia*, Case No. A-570-979 (Anti-circumvention Inquiry, Cambodia–2022) (Mar. 15, 2023), C.R. 258, Appx1163-91.

On June 9, 2022, the President of the United States declared an emergency to exist regarding the availability of sufficient electricity generation capacity to meet expected customer demand and instructed Commerce to waive any *Solar I* circumvention tariff requirements for a period of twenty-four months, in the event of affirmative circumvention findings. *Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and*

16

*Modules From Southeast Asia*, 87 Fed. Reg. 35,067 (Executive Office of the President June 9, 2022) ("Proclamation 10414").

On September 12, 2022, after an extensive period of public notice and comment, Commerce added Part 362 to its regulations to implement the President's instructions. *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Dep't Commerce Sept. 16, 2022) ("*Final Rule*"). In promulgating this *Final Rule*, Commerce determined that "the record supports . . . that an electricity supply emergency exists . . . and that to address the energy supply emergency with solar energy technology, the United States must rely, in part, on imported solar modules for the immediate future." *Id.* at 56,873.

Commerce reached preliminary affirmative determinations of circumvention on December 1, 2022, on a country-wide basis and with respect to BYD HK. *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 75,221 (Dep't Commerce Dec. 8, 2022) (preliminary affirmative determinations

of circumvention with respect to Cambodia, Malaysia, Thailand, and Vietnam) ("*Preliminary Determination*"), P.R. 431, Appx1152–62. In the *Preliminary Determination*, Commerce first found broadly that "the production performed by the respondents in the third country is not minor or insignificant" and that this "does not weigh in favor of finding circumvention." *Prelim. IDM* at 18, Appx1032. Commerce also found that the value-add contributed by the production processes in Cambodia accounted for substantially more than **[          ]** of the total value of the finished products. *See Prelim. BYD Analysis Mem.* at 4, Appx1003. Commerce nevertheless found that this relatively large value-added figure "weigh{ed} in favor of finding circumvention." *Id.*

With respect to all other aspects of the manufacturing activities that were performed in Cambodia to produce the solar cells and modules, Commerce chose to disregard the operations of the Cambodian toll-processors and instead considered only the limited activities undertaken directly by BYD HK, the Hong Kong-based trading company. Commerce accordingly found (i) that because BYD HK had made "no investment in Cambodia related to solar cells and modules" the level of investment in Cambodia weighed in favor of finding

18

circumvention; (ii) that the amount of R&D by BYD HK in Cambodia was minor or insignificant; and (iii) that the extent of BYD HK's production facilities in Cambodia was minor. In each case, Commerce considered only the activities undertaken by BYD HK in Cambodia and disregarded entirely the substantial production, investments, and other activities by the tollers actually undertaken in Cambodia to produce the merchandise subject to the inquiry. *See Prelim. IDM* at 13–19, Appx1027–1033; *see also Prelim. BYD Analysis Mem.* at 3–4, Appx1002–1003. On the basis of these findings, Commerce preliminarily determined that the operations taking place in Cambodia were "minor and insignificant," and that BYD HK was circumventing the *Solar I* Orders by manufacturing solar cells and modules in Cambodia.

In conducting its analysis of the level of investment in Cambodia, Commerce compared the level of investment in Cambodia and the level of investment of BYD HK's Chinese affiliates on an absolute rather than on a per-megawatt basis. *Prelim. IDM* at 14, Appx1028; *Prelim. BYD Analysis Mem.* at 3, Appx1002; *see also Final IDM* at 18–19, Appx1213–14. Commerce adhered to this methodology for the *Final*

19

*Determination* despite arguments from interested parties that comparisons on an absolute level are distortive because they fail to take into account the relative sizes of the markets served by the Cambodian operations on the one hand and BYD HK's Chinese affiliates on the other. *Final IDM* at 18, Appx1213.

To determine under 19 U.S.C. § 1677j(b)(2)(D) whether the value of the merchandise produced in China was a "small proportion" of the value of the merchandise that was exported to the United States, Commerce chose to apply a non-market economy ("NME") methodology to value Chinese-produced inputs that were used to produce solar cells and modules in the inquiry country. Specifically, Commerce based its calculations on inflated "surrogate values" derived from a third country, rather than the actual lower amounts paid for the inputs. *Prelim. BYD Analysis Mem.* at 4, Appx1003; *Final IDM* at 44–45, Appx1239–40. BYD HK objected that this methodology is inappropriate for an inquiry involving production in a market economy country and distorted and overstated the significance of the Chinese inputs. *Prelim. BYD Analysis Mem.* at 4, Appx1003; *Final IDM* at 44–45, Appx1239–40 (citing Brief from Hogan Lovells US LLP to the U.S. Department of Commerce, *2022*

20

*Circumvention Inquiry of Antidumping Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Second Tranche Case Brief*, Case No. A-570-979 (Anti-circumvention Inquiry, Cambodia–2022) (Mar. 24, 2023), C.R. 265, Appx11969–99, at 17, Appx11993.

On August 23, 2023, Commerce published its *Final Determination*. Commerce affirmed each of its preliminary findings with respect to the statutory factors provided at 19 U.S.C. § 1677j(b) and continued to find that "BYD HK's process of assembly or completion in Cambodia of the solar modules shipped to the United States {was} minor or insignificant." *Final IDM* at 61, 67, Appx1256, 1262. In addition, Commerce found action under the circumvention statute to be "appropriate" in light of Commerce's other finding that the criteria for circumvention were met. *Id.* at 76, Appx1271. Commerce thus found that BYD HK had circumvented the *Solar I* Orders and issued affirmative country-wide and company-specific findings of circumvention with respect to Cambodia and BYD HK.

## III.   STANDARD OF REVIEW

In appeals of final antidumping duty and countervailing duty determinations, the Court shall hold unlawful and remand any administrative determination by Commerce that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In making its judgment, the Court "reviews the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks and citation omitted), and determines "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo*

*Elecs. Co. v. Int'l Union of Electronic Elec., Technical, Salaried & Mach. Workers*, *AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation marks and citation omitted). Commerce must provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

Commerce is also required by law to include in its final determination "an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties who are parties to the investigation or review." 19 U.S.C. § 1677f(i)(3)(A). *NMB Sing. Ltd.* v. *United States,* 557 F.3d 1316, 1320 (Fed. Cir. 2009). Further, the Court will not sustain Commerce's determination when Commerce failed to address a party's relevant argument. *See Nucor Corporation v. United States*, 461 F. Supp. 3d 1374, 1380 (Ct. Int'l Trade 2020) (*citing Stein Industries Inc. v. United States*, 365 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade 2019)).

Commerce's "total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders {a determination} unsupported by substantial evidence." *Ceramark Technology v. United States*, 11 F.Supp.3d 1317,

23

1323 (Ct. Int'l Trade 2014) (citing *Allegheny Ludlum Corp. v. United States*, 24 C.I.T. 452, 479, 112 F.Supp.2d 1141, 1165 (Ct. Int'l Trade 2000)). This Court has further held that "reasons for the choices made {by Commerce} among various potentially acceptable alternatives usually need to be explained." *Bando Chemical Industries, Ltd. v. United States*, 16 C.I.T. 133,136, 787 F. Supp. 224, 227 (Ct. Int'l Trade 1992). The Federal Circuit has similarly held "we must determine the existence of substantial evidence by considering the record as a whole, including evidence that 'fairly detracts from the substantiality of the evidence{,}'" which is to say that the evidence must be analyzed on both sides of an issue. *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citing *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

Finally, Commerce's determinations must in all cases be consistent with the governing statute and the agency's regulations. Following the Supreme Court's recent decision in *Loper Bright Enterprises et al. v. Raimondo*, 603 U.S. __ (2024) (slip op. 22–451), in which the Court overruled *Chevron, U.S.A., Inc. v. N.R.D.C, Inc*, 467 U.S. 837 (1984), Commerce's interpretations of statutory provisions are

24

not entitled to deference by this Court. Instead, "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper*, slip op. at 35. In other words, this Court must determine not whether an agency's "reading {is} 'permissible' in such a case," *id.* at 23, as *Chevron* directed, *Chevron*, 467 U.S. at 843, but rather whether the agency's interpretation reflects "the best reading of the statute. . . ." *Loper*, slip op. at 23. [1] In so doing, "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires . . . {and} need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 35.

Even before the Supreme Court's decision in *Loper*, no deference was owed to Commerce when the intent of Congress is judicially ascertainable. *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881–82

---

[1]    The Court's reasoning in *Loper* helps explains the analysis that this Court must undertake: "{W}hen courts confront statutory ambiguities in cases that do not involve agency interpretations or delegations of authority, they are not somehow relieved of their obligation to independently interpret the statutes." *Loper*, slip op. at 5; *see also id.* at 22–24.

(Fed. Cir. 1998). This requires the Court to "first carefully investigate the matter to {discern} Congress's purpose and intent on the question at issue." *Id.* at 881. In determining the plain meaning of statutory language, the Court is required to employ the traditional tools of statutory construction (*e.g.*, dictionary definitions, grammatical structure). *See, e.g.*, *Pesquera Mares Australes v. United States*, 266 F.3d 1372, 1382–83 (Fed. Cir. 2001) (relying on the dictionary definition of a key phrase in a statute); *Anhydrides & Chemicals, Inc. v. United States*, 130 F.3d 1481, 1483 (Fed. Cir. 1997) ("The rules of grammar apply in statutory construction"). If appropriate, the Court must also consider the legislative history to determine congressional intent. *Timex*, 157 F.3d at 882 (citing *Chevron*, 467 U.S. at 843 n.9).

The Court must also ensure that Commerce has complied with Commerce's own regulations, assuming those regulations are consistent with the statute. The law related to an agency's interpretation of its own regulations appears to remain undisturbed by *Loper*. The Court must give effect to the plain meaning of Commerce's regulations and owes no deference to Commerce's interpretation of a regulation for which the Court can discern a clear meaning. *Kisor v. Wilkie*, 139 S. Ct.

2400, 2419 (2019); *JBLU, Inc. v. United States*, 813 F.3d 1377, 1380
(Fed. Cir. 2016) ("If a regulation is clear on its face, no deference is
given to the promulgating agency's interpretation, and {the court}
interpret{s} the regulation in accordance with its unambiguous
meaning.") (internal citation removed). The Court may defer to
Commerce's interpretation of its regulations "only when that legal
toolkit is empty and the interpretive question still has no single right
answer." *Kisor*, 139 S. Ct. at 2415. In making this determination, the
Court must examine the "text, structure, history and purpose" of the
regulation, *id.*, and "{t}he fact that a term is not defined by a regulation
does not make it ambiguous and entitled to deference." *JBLU*, 813 F.3d
at 1380.

## IV.  ARGUMENT

Commerce's affirmative circumvention determination has
massively expanded the scope of the *Solar I* Orders to include solar cells
and modules manufactured in Cambodia, Malaysia, Thailand, Vietnam
that were previously unquestionably outside the scope of the orders.
This scope expansion was made in the absence of any USITC finding
that imports from these countries actually materially injured or

threaten to injure the domestic industry. And Commerce expanded the scope notwithstanding its own repeated determinations that any solar cells on which the p/n junction was formed outside of China were intended to be excluded from the scope of the *Solar I* Orders. Multiple companies around the globe made large investments in manufacturing facilities in the targeted countries in direct reliance on the established scope of these orders as previously, and repeatedly, clarified by Commerce.

In the case of BYD HK's Cambodian suppliers, these investments in local manufacturing plants and equipment are significant, the value-added in Cambodia substantially exceed **[          ]** of the value of the exported merchandise, and the processing performed in Cambodia is (by Commerce's own repeated acknowledgement) a "sophisticated," "transformat{ive}," and "multi-step" process. *Prelim. IDM* at 17–18, Appx1031–1032. Commerce nevertheless—astonishingly—found that these same processes are "minor or insignificant," thereby treating these solar cells and modules as if they were manufactured in China (*i.e.*, subject to the *Solar I* Orders).

28

As discussed below, this finding by Commerce is deeply flawed. Commerce has radically departed from the text of the statute which permits the wholesale expansion of AD/CVD orders only where the processing at issue is shown to be truly "minor" or "insignificant." Commerce has disregarded this narrowly defined authority granted by Congress in favor of a far more liberal interpretation of the "minor or insignificant" standard that effectively requires that the *majority* of processing costs and investment and the *most significant* elements of processing occur in the third country. Commerce, in short, has applied the wrong statutory standard.

As further discussed below, Commerce also committed other reversible errors in reaching its determination, including the agency's outright refusal to consider the actual operations performed in Cambodia by the processors at issue, focusing instead on the operations of BYD HK. Commerce also applied a number of unreasonable calculation methodologies that understated the significance of the processing in Cambodia including the inappropriate valuation of Chinese inputs using surrogate values rather than actual input values, even though Cambodia is a market economy, and the unreasonable

comparison of investment levels in China and Cambodia based on absolute values rather than per-unit values. Finally, Commerce improperly determined that it is otherwise "appropriate" to expand the *Solar I* Orders to Cambodian production notwithstanding nearly a decade of reliance by manufacturers on the scope of the orders as clarified by Commerce.

### A.    Commerce Misapplied the Statutory "Minor or Insignificant" Standard

The statute governing these inquiries sets out five statutory criteria that Commerce must consider in determining whether a product completed or assembled in Cambodia may be included within an AD or CVD order on products from China: [2]

- (A)    Whether the merchandise imported into the United States from Cambodia is the same class or kind as merchandise that is subject to the *Solar I* Orders;

- (B)    Whether before importation into the United States, such merchandise is completed or assembled in Cambodia from merchandise that is subject to the *Solar I* Orders  or

---

[2]    19 U.S.C. § 1677j(b)(1). Moreover, in determining whether to include merchandise assembled or completed in a foreign country within the scope of an order, Commerce takes into account such factors as the pattern of trade, including sourcing patterns, affiliations, and whether imports into the foreign country of the merchandise have increased after initiation of the investigation that results in the order. 19 U.S.C. § 1677j(b)(3).

produced with inputs from the country under the *Solar I* Orders;

(C)   Whether the process of assembly or completion in Cambodia is minor or insignificant; [3]

(D)   Whether the value of the merchandise produced in the country subject to the *Solar I* Orders is a significant portion of the total value of the merchandise exported to the United States; and,

(E)   Whether the action is appropriate to prevent evasion of the *Solar I* Orders. [4]

Criteria (A) and (B) are conceded to have been met. The Cambodian cells and modules are in the same "class or kind" as merchandise subject to the *Solar I* Orders and they were produced using some inputs from China.

---

[3]   In assessing whether a process is "minor or insignificant," the statute directs Commerce to take into account:

(A)   the level of investment in the foreign country;

(B)   the level of R&D in the foreign country;

(C)   the nature of the production process in the foreign country;

(D)   the extent of production facilities in the foreign country; and,

(E)   whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

*See* 19 U.S.C. § 1677j(b)(2).

[4]   19 U.S.C. § 1677j(b)(1)(E).

At the heart of Commerce's error in this case is the agency's flagrant misapplication of the statutory standard set forth in criterion (C) addressing whether the process Cambodian manufacturing process could be considered "minor or insignificant." As discussed below, Commerce has effectively taken the position in this case that the operations in Cambodia must be considered "minor or insignificant" unless it can be shown that those operations account for a *large* portion (or even a majority) of the investment, value-added, and processing operations required to manufacture the finished goods. That interpretation simply cannot be squared with the plain meaning of the statutory text and is thus unlawful. *Loper*, slip op. at 23 ("In an agency case as in any other, though, even if some judges might (or might not) consider the statute ambiguous, there is a best reading all the same— 'the reading the court would have reached' if no agency were involved.").

The Court must use "all relevant interpretive tools" in interpreting the statute, *id.*, starting with the provision's plain meaning. "In order to ascertain the 'established meaning,' {of a statutory term} it is {generally} appropriate to consult dictionaries." *See Pesquera*, 266 F.3d at 1382–83 (*citing Int'l Bus. Machs. Corp. v. United*

*States*, 201 F.3d 1367, 1372 (Fed. Cir. 2000); *Best Power Tech. Sales Corp. v. Austin*, 984 F.2d 1172, 1177 (Fed. Cir. 1993). "Minor" is defined as "inferior in importance, size, or degree." *Minor*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/minor (last visited July 2, 2024). "Insignificant" means "{d}evoid of significance, weight, or force; {o}f no importance or moment; immaterial; trivial, trifling; mean, contemptible." *Insignificant*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/insignificant_adj?tab= meaning_and_use#351290 (last visited July 2, 2024). Together, the phrase "minor or insignificant" clearly evinces Congress's intent to expand the application of AD/CVD orders outside their existing scope only where third-country processing is truly limited—*i.e.*, involving "immaterial, trivial, trifling" activities performed outside of the country subject to an AD/CVD order prior to importation to the United States. Under the governing standard of review, therefore this Court should not defer to an interpretation of this standard by Commerce that would treat processing that is "significant" as nevertheless "minor or insignificant." *Loper*, slip op. at 35.

33

This plain meaning of the phrase "minor or insignificant" is bolstered by legislative history and Congressional intent. Congress, in amending the relevant statutory circumvention provisions in 1994, explained that the logic of circumvention proceedings rests on the idea that producers in a country subject to an existing AD/CVD order could set up a "screwdriver" assembly in a third country to change the country of origin and circumvent the order. Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994) ("SAA") at 893–94. Congress clearly did not intend to grant Commerce with authority to enforce the circumvention remedy whenever the level of processing in the third country is less than the level of processing in the country under order, as Commerce appears to now believe. Congress intended instead for Commerce to assess the nature of the production process and find circumvention only in cases where the operations were truly "minor or insignificant"—*i.e.*, "immaterial, trivial, trifling."

Viewed in the context of the broader trade remedy statutory schema, this proper, narrower view of the circumvention standard makes perfect sense. The circumvention statute is an extraordinary

34

exception to the general statutory scheme for application of trade measures. Where applied, the circumvention authority enables Commerce to expand the scope of existing orders without following the more rigorous and involved procedures associated with new AD/CVD investigations (including the requirement that the ITC conduct a separate investigation and render a separate affirmative injury finding). The statute enables Commerce to do this, however, only where the processing in a third country is so "minor or insignificant" that the merchandise being exported from that third country can reasonably be considered as having been manufactured in the country on which the AD/CVD orders have already been imposed (in this case, China). Conversely, using this statute to expand orders to cover goods substantially made in third countries where the processes undertaken to make those goods are "sophisticated," "complex," and "transformative" upends the carefully designed statutory framework and allows the circumvention statute to encroach on the role of the AD/CVD investigation statute.

Commerce's expansive interpretation and application of the "minor or insignificant" standard in this case is clearly wrong. As

summarized in Section II above, Commerce found that the weighted average of the value added in Cambodia for a BYD HK module exported to the United States was **[        ]** percent of the total value of the module. Yet Commerce determined that this amount constituted a "small proportion." *Final IDM* at 63–64; Appx1258–59. As explained above, Commerce's capacious interpretation of this standard cannot be squared with the statute's unambiguous requirement that the operations in the third country must be "minor or insignificant" for third-country produced goods to be eligible for inclusion in the scope of an existing order on another country, skirting the otherwise applicable investigation and injury requirements.

In fact, it is difficult to imagine what standard Commerce was applying in order to reach the conclusion that a value-added exceeding **[            ]** of the value of the imported product is "minor" or "insignificant." Although Commerce does not reveal what level of value-added would overcome this threshold, the implication is that it would have to substantially exceed **[    ]** percent, possibly suggesting, contrary to the statute, that the value added through processing in the third country must account for a *majority* of the total cost of the

36

finished product. It is impossible to square that standard with the actual language of the statute that speaks in terms of "minor or insignificant."

The standard for "minor and insignificant" applied by Commerce is also clearly misapplied from a qualitative standpoint. Commerce made numerous key findings on the complex and extensive nature of CSPV cell production (which took place in Cambodia) through its comparison to the production of upstream polysilicon ingots and wafers (*i.e.*, the processes upstream from cell production). These findings, too, conflict with the "minor or insignificant" standard in the text of the statute, particularly in light of Congress's emphasis on the qualitative nature of the processing at issue.

First, Commerce observed that the production of CSPV cells involves "significant technical requirements. . . and changing technologies." *Final IDM* at 34, Appx1229. Specifically, Commerce found that:

> Technology improvements in the wafer-to-cell process are responsible for most of the performance improvements of solar panels. Because of technological improvements to solar cells, module makers must regularly upgrade

> their production lines to avoid becoming obsolete.
> Hence, there are also meaningful technological
> requirements that must be met before producing
> solar cells.

*Id.* (internal quotations omitted). As for labor, Commerce found that

CSPV cell and module production requires significantly more direct

manufacturing workers as well as a skilled labor force, when compared

to ingot and wafer production. *Id.* at 35, Appx1230.

More critically, Commerce emphasized the nature of production

performed in *each* production step of the CSPV cell process:

> The IEA Report specifies that while each segment
> of the manufacturing processes require various
> types of special equipment, solar cell production
> requires sophisticated, precise and advanced
> automation equipment, and solar module
> production requires highly automated machinery
> and accurate quality-testing requirement at
> multiple stages. Meanwhile, the IAE Report
> indicates that ingot production uses simpler,
> more conventional equipment. Therefore,
> producing solar cells and modules in the inquiry
> country involves a multi-step production process
> that requires more precise and sophisticated
> equipment at multiple stages compared to
> producing ingots and wafers in China.

*Id.* (internal quotations omitted). Commerce also emphasized that

CSPV cell and module production requires *over 100 different inputs*,

"whereas converting polysilicon into wafers only involves a handful of inputs." *Id.* (emphasis added).

Under any reasonable application of the "minor and insignificant" standard, Commerce's inquiry should have ended as soon as it found that the value-added in Cambodia exceeded **[        ]** and the nature of the Cambodian processing—the processing at the heart of Commerce's inquiry—was neither minor nor insignificant. But it did not.

Commerce's contrary finding that the processing in Cambodia was nevertheless "minor or insignificant" therefore betrays a fundamental misapprehension of the statutory standard. Under any reasonable interpretation of the statute, processing performed in Cambodia that adds over **[        ]** of the value and involves a process that is recognized as significant and complex could not also be considered "minor or insignificant." Commerce's affirmative circumvention finding should be reversed on that basis.

**B.    Commerce Erred by Ignoring the Activities of the Tollers in Cambodia**

In determining whether the process undertaken in Cambodia is "minor or insignificant," Section 781 of the Act directs Commerce to take into account the "level of investment in {Cambodia}," "level of

research and development in {Cambodia}," and the "extent of production facilities in {Cambodia}," along with two other enumerated factors. 19 U.S.C. § 1677j(b)(2).

In the *Final Determination*, Commerce unlawfully ignored the investments and production facilities of the unaffiliated Cambodian tollers who were actually engaged in the processing operations in Cambodia, focusing instead exclusively on the investments and production facilities of BYD HK in Cambodia—again, a Hong Kong-based trading company with no direct operations in Cambodia. Because the unaffiliated Cambodian toll processors were the parties conducting all of the processing in Cambodia, not BYD HK, Commerce concluded that the processing in Cambodia was minor or insignificant. In doing so, Commerce unlawfully ignored entirely relevant material evidence on the record addressing these two statutory prongs. As explained below, Commerce's approach was contrary to the statute, unsupported by substantial evidence, and otherwise not in accordance with law.

1.    **Commerce's Analysis Unlawfully Ignored the Cambodian Toll Processors' Substantial Investments and Production Facilities**

As discussed above, the statute sets out the factors that Commerce may consider in determining whether the third-country processing is "minor or insignificant," including the "level of investment in the foreign country" and the "extent of production facilities in the foreign country." *See* 19 U.S.C. § 1677j(b)(2)(A). Importantly, the *ownership* of these facilities is not a factor that Congress directed Commerce to consider as part of that analysis.

The statute directs Commerce, without qualification, to consider "the process of assembly or completion in the third country"—in this case Cambodia—and to determine if that processing performed in Cambodia is "minor or insignificant." Nowhere in the statute does it state or imply that the identity or ownership of the company performing the processing is even relevant, let alone decisive, in determining whether the processing at issue is minor or insignificant. And there is no evidence that Congress viewed such an analysis as relevant to the

"minor or insignificant" determination.[5] Instead, consistent with the statutory provision itself, Commerce must consider *all* of the relevant processing performed in Cambodia regardless of affiliation. *See Loper*, slip op. at 31. Quite simply, for purposes of the circumvention analysis, it is what goes on in the inquiry country that is at issue, not who does it.

Commerce's decision is also at odds with its past practice. For instance, in *Stainless Steel Sheet and Strip from the People's Republic of China*, Commerce noted that one respondent, Silverwood, operated solely as a trading company that sold stainless steel sheet and strip ("SSSS") to the United States which was produced by another respondent in the proceeding. Yet Commerce (correctly) analyzed the SSSS products produced and sold by the other respondent, POSCO VST, in conducting its circumvention analysis. *See Stainless Steel Sheet and Strip from the People's Republic of China: Scope and Circumvention Inquiries Covering Exports from the Socialist Republic of Vietnam*

---

[5]    The statute does indicate that one of the factors to be considered in assessing whether to include the merchandise in the scope of the order is whether the manufacturer in the third country is related to the party that supplied inputs from the country under order. *See* 19 U.S.C. § 1677j(b)(3) However, that factor actually works *against* an affirmative circumvention finding in this case because BYD HK is *not* affiliated with any of the toll processors in Cambodia.

42

(preliminary scope and circumvention determinations) 87 Fed. Reg. 56,626 (Dep't Commerce Sept. 15, 2022); *see also* Brief from Hogan Lovells US LLP to the U.S. Department of Commerce, *2022 Circumvention Inquiry of Antidumping Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Second Tranche Case Brief*, Case No. A-570-979 (Anti-circumvention Inquiry, Cambodia–2022) (Mar. 24, 2023) at 5, 8–9, C.R. 265, Appx11974, 11977–11978; P.R. 497, Appx19115–19141

In the *Final IDM*, Commerce attempted to distinguish this case on the grounds that, "{u}nlike in SSSS from China, BYD's tollers were not separately selected as mandatory respondents and we were not able to verify its unaffiliated toll processors." *Final IDM* at 52, Appx1247. But, whether or not the tollers were treated as mandatory respondents cannot change the statutory focus of the circumvention inquiry which is whether "the process of assembly or completion in the foreign country . . . is minor or insignificant." 19 U.S.C. § 1677j(b)(1)(C). As noted above, that analysis is focused on the significance of the processing that is performed in the inquiry country, not who performs it.

The suggestion that Commerce was somehow hindered from conducting this statutory analysis is also false. BYD and the relevant tollers cooperated fully with Commerce's investigation and responded to all information requests directed to them. Commerce is also unable to point to any evidence suggesting that the record data on the tollers' investments or production processes is inaccurate or unreliable. Commerce's claim that it was "unable" to verify the tollers' data is also misleading. In fact, Commerce could have requested an onsite verification of the Cambodia tollers, but chose not to.

### 2. The Investments and Production Facilities in Cambodia Are Not "Minor or Insignificant"

Rather than conduct an analysis of the investment in Cambodia as the "foreign country" at issue as the statute clearly directs, Commerce instead evaluated the statutory factors solely with reference to BYD HK's own investments, to the exclusion of other investments relevant to Commerce's analysis. As discussed above, there is no basis or support in the statute for Commerce to exclude from its assessment of the "level of investment in the foreign country" investments that were not made by BYD HK. As a result of this error, Commerce's analysis in the *Final Determination* failed to account for all of the investments

44

associated with the processing performed in Cambodia required by the statute and is thus unsupported by substantial evidence on the record and otherwise not in accordance with law.

Based on this legally deficient analysis, Commerce found that "BYD HK has made no investments in Cambodia related to solar cells and modules and {found} BYD HK's investments in Cambodia to be minor or insignificant," *BYD HK Prelim. Analysis Mem.* at 3, C.R. 185, Appx1000–1007, and that it would have been "unreasonable to use the investments/production facilities of BYD HK's unaffiliated tollers as the basis for comparison in Cambodia when BYD HK contributed nothing to such investments/production facilities," *Final IDM* at 51, Appx1246.

However, when due account is taken of the tolling operations at issue, the record demonstrates that the investments in manufacturing in Cambodia are in fact both very large and substantial. The startup costs for BYD HK's Cambodian tollers were in excess of USD $**[**

**]**, and over USD $**[**                              **]** Shangluo BYD's startup costs. *BYD HK Prelim. Analysis Mem.* at 3, C.R. 185,

Appx1000–1007.[6] Expressed as a percentage, the investment made for the startup of the tollers' operations was nearly **[    ]** percent greater than that made to start up Shangluo BYD. *Id.* In other words, when Commerce properly follows the statute by taking into account the total investment associated with the processing in Cambodia, the "level of investment" in Cambodia undoubtedly provides further significant support to a negative circumvention finding for BYD HK.

Commerce also ignored the factory sizes, capacity, and number of workers at the facilities of the relevant toll producers in Cambodia:

| | **Shangluo BYD** | **Tollers** | **Tollers vs. Shangluo (%)** |
|---|---|---|---|
| **Factory Size** | [ | | ] |
| **Capacity** | [ | | ] |
| **Workers** | [ | | ] |

*Preliminary Determination*, *BYD HK Prelim. Analysis Mem.* at 3–4, Appx1002–1003 (unchanged in the *Final Determination*).

When properly taken into account, these figures demonstrate that the production facilities in Cambodia were extensive in their own right

---

[6]    As noted above, the tollers were supplied with wafers by BYD HK's affiliated wafer supplier, Shangluo BYD. Commerce's used Shangluo BYD's ingot and wafer operations in comparing the operations in China and Cambodia. *Final IDM* at 51, Appx1246.

(and in comparison to those of Shangluo BYD in China) and therefore favor a negative circumvention finding. Commerce's refusal to consider the operations of the Cambodian toll processors—the very parties who were engaged in the processing under consideration for circumvention—was a fundamental error that is contrary to the dictates of the statute. Commerce's consequential determination that the manufacturing operations in Cambodia are "minor or insignificant" was therefore contrary to law and has no support in the record.

## C.    Commerce's Value-Added Analysis Was Flawed

The statute directs Commerce to take into account, as part of its assessment of whether the process undertaken in Cambodia is "minor or insignificant," "whether the value of the processing performed in {Cambodia} represents a small proportion of the value of the merchandise imported into the United States." 19 U.S.C. § 1677j(b)(2)(E). In the *Final Determination*, Commerce found that the value added from processing performed in Cambodia represented [    ] percent of the value of the finished solar modules imported into the United States. *BYD HK Final Analysis Mem.* at 2, Appx1193.

Commerce determined that this value-added amount "weighed in favor of finding circumvention." *Final IDM* at 63–64; Appx1258–1259.

As explained in detail below, Commerce's finding that this level of value-added supports a "minor or insignificant" finding is flawed for at least two reasons: (1) Commerce relied upon an impermissible interpretation of the statute; and (2) Commerce failed to conduct the "qualitative" assessment of value-added in the third country mandated by Congress.

### 1.    Commerce Relied Upon an Impermissible Interpretation of the Statute

As explained in detail in Section III.A., above, Commerce has misapplied the statutory "minor or insignificant" standard and its analysis was therefore legally flawed. By Commerce's own calculations, the Cambodian processing at issue contributed greater than **[          ]** of the value of the exported merchandise. It is simply unreasonable for Commerce to have considered this level of processing to be minor or insignificant (*i.e.*, "immaterial, trivial, trifling."). This is especially true because the nature of the processes creating the value-added were acknowledged by Commerce to be "sophisticated," "expensive," and

"multi-stage{d}" using "high-technology machinery and workers with strong technical knowledge." *Prelim. IDM* at 17.

Commerce's conclusion that this level of value-added was "small" is also inconsistent with several other circumvention cases in which Commerce determined that *significantly lower* levels of value added did not support an affirmative circumvention finding. For example, Commerce has reached negative circumvention determinations where the value of processing performed in the exporting country was lower, ranging from 12 to 26 percent, and from 10 to 29 percent. *Ferrovanadium and Nitrided Vanadium From the Russian Federation*, 77 Fed. Reg. 6,537, 6,539 (Dep't Commerce Feb. 8, 2012) (preliminary negative determination and extension of time limit for final determination of circumvention of the antidumping duty order) (Commerce rendered a negative final determination in this case as well). *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the UK*, 64 Fed. Reg. 40,336, 40,340 (Dep't Commerce Jul. 26, 1999) (negative final determination of circumvention of

49

antidumping and countervailing duty orders). 7/ Indeed, Commerce

determined in another circumvention case that **[**

**]** did *not* constitute a "small

proportion," as defined by 19 U.S.C. § 1677j(b)(2)(E) (emphasis added).

*See Certain Tissue Paper Products from the People's Republic of China*,

73 Fed. Reg. 21,580, 21,585–86 (Dep't Commerce Apr. 22, 2008)

(affirmative preliminary determination of circumvention of the

antidumping duty order and extension of final determination)

(unchanged in Final Determination).

     These prior decisions seriously undermine Commerce's conclusion

in this instance that creating over **[**      **]** of the value of the

exported product in Cambodia was nevertheless "small," "minor" or

"insignificant." Consistent the plain meaning of the statutory language

---

7    These earlier cases involve circumvention findings under 781(a) of the Tariff Act where completion or assembly occurred in the United States. However, as Commerce also acknowledges in discussing a separate issue in the Final IDM, the two statutory provisions—781(a)(2) (U.S. circumvention) and 781(b)(2) (third-country circumvention)—have almost identical language regarding Commerce's analyses related to the value of processing. *Final IDM* at 28, Appx1223 ("Although these two cases were circumvention inquiries conducted under section 781(a) of the Act, similar statutory language applies to sections 781(a)(2) and 781(b)(2).").

and prior Commerce practice, Commerce could not reasonably find in

the *Final Determination* that this high value-added in Cambodia

"represents a *small proportion* of the value of the merchandise imported

into the United States." *BYD HK Prelim. Analysis Mem.* at 4

(unchanged in *Final Determination*).

### 2.    Commerce Failed to Conduct the Required Qualitative Value-Added Analysis

Commerce's value added analysis is further flawed because

Commerce failed to evaluate the value added on a qualitative basis as

directed by Congress. The statute directs Commerce to determine

whether the value of the processing performed in the third country

represents a small proportion of the value of the merchandise imported

into the United States. 19 U.S.C. § 1677j(b)(2)(e). In evaluating this

factor, "Congress has directed {the Department} to focus more on the

nature of the production process and less on the difference in value

between the subject merchandise and the parts and components

imported into the processing country." *Polyethylene Terephthalate Film,*

*Sheet, and Strip from the United Arab Emirates*, 80 Fed. Reg. 26,229

(Dep't Commerce May 7, 2015) (preliminary negative determination of

circumvention of the antidumping order), and accompanying Issues and

Decision Memorandum at 7. Indeed, Commerce has appropriately followed this direction in a series of prior circumvention inquiries. *See Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom*, 64 Fed. Reg. 40,336, 40,347 (Dep't Commerce July 26, 1999) (negative final determinations of circumvention of antidumping and countervailing duty orders); *Certain Corrosion-Resistant Steel Products from Taiwan*, 84 Fed. Reg. 32,864 (Dep't Commerce July 10, 2019) (affirmative preliminary determination of anti-circumvention inquiry on the antidumping duty order) and accompanying Issues and Decision Memorandum; *Small Diameter Graphic Electrodes from the People's Republic of China,* 77 Fed. Reg. 33,405, 33,413 (Dep't Commerce June 6, 2012) (affirmative preliminary determination of circumvention of the antidumping duty order and extension of final determination); *Certain Pasta from Italy*, 68 Fed. Reg. 46,571, 46,575 (Dep't Commerce Aug. 6, 2003) (affirmative final determinations of circumvention of antidumping and countervailing duty orders) (unchanged in *Certain Pasta from Italy*, 68 Fed. Reg. 54,888 (Dep't Commerce Sept. 19, 2003) (affirmative final determinations of circumvention of antidumping and countervailing

duty orders); NextEra Comments at 43-47, P.R. 157, Appx12928–15366 (discussing this qualitative analysis and related facts for Commerce to consider in conducting this analysis). Therefore, in conducting the value-added analysis, the agency shall not conduct only a comparison between the value of the subject merchandise and the value of the relevant inputs in analyzing whether circumvention has occurred. Instead, Congress has instructed Commerce to adopt "a more qualitative focus on the nature of the production process," rather than "a rigid numerical calculation of value-added."  SAA at 893.

In fact, Commerce conducted a qualitative analysis of the processing in Cambodia in its review of the "nature" of the production process and concluded in both its *Preliminary Determination* and its *Final Determination* that "record evidence shows that the nature of the production process in Cambodia for solar cells and modules is significant." *Prelim. IDM* at 22, Appx1036; *Final IDM* at 32, Appx1227. Commerce highlighted that:

> the production of solar cells and solar modules in the inquiry countries has greater labor demands, more steps, and requires more inputs than ingot and wafer production in China. Moreover, the multi-step solar cell and solar module production process requires sophisticated, precise, and

technologically advanced equipment, and a
skilled workforce. Production of solar cells and
wafers involves more than attaching Chinese
components together. Solar cell and solar
modules production involve exacting processes
(e.g., molecular-level impregnation of phosphorus
into the wafer at a high heat, printing solar cells
(metals, such as silver paste, are printed onto the
solar cell to collect electricity)) and treatments to,
and preparation of, inputs used in production
(such as lamination and curing of EVA, solar
cells, and the backsheet).

Importantly, the essential nature of the final
product is imparted and realized through
production in the inquiry country when the p/n
junction is formed in the wafer. The p/n junction
"… results in the creation of solar cells—albeit
unfished solar cells—capable of converting
sunlight into electricity via the photovoltaic
effect." Moreover, other components in the solar
cell and solar module are important to its ability
to function because they channel the electricity
out of the cell so that the product can be used as
intended. We do not believe that the technical
hurdles associated with ingot and wafer
production outweigh the above facts when
comparing the nature of producing ingots and
wafers to the nature of producing solar cells and
solar modules.

*Final IDM* at 36, Appx1231 (footnotes omitted). The error is that

Commerce failed to import this qualitative analysis into its value-added

assessment as Congress has directed.

In the *Final Determination*, Commerce sought to defend its position that its value-added determination should be quantitatively focused by arguing that the "overall circumvention inquiry" is oriented to the *nature* of the production process, not the value-added analysis. *See Final IDM* at 65–66, Appx1260–1261. But, in doing so, Commerce directly misconstrued its own prior decisions interpreting the qualitative analysis as relevant specifically to the value-added factor. For instance, in explaining the agency's determination regarding the value of processing under 781(b)(2)(E) in *PET Film from Bahrain*, Commerce explained that "{i}n past anti-circumvention inquiries, the Department has recognized that *under this factor* Congress has directed it "to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the parts and components imported into the processing country." NextEra Comments at Att. 36-D, *Memorandum from Christian Marsh to Paul Piquado, Anti-Circumvention Inquiry of the Antidumping Duty Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates* (Dep't Commerce May 1, 2015) (preliminary decision memorandum), P.R. 160, Appx. 14027–14035 (emphases added).

Commerce's precedents are therefore clear that congressionally-
mandated focus on the nature of the process performed in the third
country is related to the value-added prong of the analysis specifically,
and—notwithstanding Commerce's erroneous characterization to the
contrary—*not* the circumvention analysis more broadly. Commerce's
failure to evaluate the value-added factor with reference to its findings
regarding the qualitative nature of the underlying manufacturing
processes was legally flawed, internally inconsistent, and constitutes
reversible error.

## D.    Commerce Assigned Undue Weight to the R&D Factor, Which Distorted its Analysis

One of the factors Commerce is directed to consider in evaluating
whether the processing is minor or insignificant is the level of R&D
associated with processing in the foreign country. *See* 19 U.S.C.
§ 1677j(b)(2)(B). In this case, Commerce found R&D to be of
"preeminent importance" given that "R&D has been key for
technological breakthroughs" in CSPV technology. *Final IDM* at 62,
Appx1257; *see also Prelim. IDM* at 22, Appx1036 (giving "particular
importance" to the levels of R&D "given the uniquely complex nature of
solar cell and module production."). As with other factors under

56

consideration, however, Commerce evaluated this factor *solely with respect to BYD HK's activities in Cambodia*, even though the manufacturing activities in Cambodia at issue were undertaken instead by unaffiliated toll-processors. Having defined the analysis in these terms, Commerce found that BYD HK is a trading company that did not conduct R&D in Cambodia. Commerce then placed decisive weight on this factor in determining that the processing in Cambodia was minor and insignificant. *See Final IDM* at 62, Appx 1257. This analysis was distortive and unlawful for the reasons outlined below.

Commerce improperly placed decisive weight on the importance of R&D. As explained above, the statute requires Commerce to consider five factors in determining whether the process of assembly or completion in the foreign country is minor or insignificant, including the level of R&D. Nothing in the text of the statute indicates that R&D should be afforded "particular importance." Furthermore, Congress indicated that "Commerce will evaluate each of these factors as they exist either in the United States or a third country" and that "{n}o single factor will be controlling." SAA at 4,216. In short, nothing in the legislative history privileges R&D or permits Commerce to afford R&D

determinative status. It is thus not a permissible interpretation. *Loper*, slip op. at 23.

Indeed, Commerce has previously acknowledged that limited R&D alone is an insufficient basis for an affirmative circumvention determination. To the contrary, Commerce has explained that R&D should normally be given *less* weight than the other statutory factors. For instance, Commerce has explained that:

- "A lack of {R&D} expenses does not necessarily mean that circumvention exists," *Certain Welded Carbon Steel Standard Pipes and Tubes from India,* 87 Fed. Reg. 52,507 (Dep't Commerce Aug. 26, 2022) (preliminary negative determinations of circumvention of the antidumping order) and accompanying Issues and Decision Memorandum at 16 (unchanged in final).

- "A lack of {R&D} expenses . . . provides no information as an informative factor in determining whether the Order is being circumvented," *Id*.; and,

- A "lack of significant R&D expenses . . . is not informative in determining whether processing in {the third country} is minor or insignificant." *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan*, 88 Fed. Reg. 21,980 (Dep't Commerce Apr. 12, 2023) (preliminary affirmative determination of circumvention of the antidumping duty order) and accompanying Issues and Decision Memorandum at 14.

Moreover, Commerce has repeatedly asserted that the level of R&D is *less* informative in determining whether third-country processing is "minor or insignificant" than the other statutory factors

58

under section 781(b)(2). For example, in *Certain Aluminum Foil from the People's Republic of China*, Commerce explained as follows:

> The factors involving the level of investment, *the level of R&D*, and the extent of the production facilities in {the third country} weigh less heavily in our determination than the factors involving the nature of the production process and the value added in {the third country} because the former relate more broadly to the companies and their facilities, whereas *the latter relate more to the production of the inquiry merchandise itself*.

88 Fed. Reg. 17,177 (Dep't Commerce Mar. 22, 2023) (preliminary affirmative determinations of circumvention with respect to the Republic of Korea and the Kingdom of Thailand) and accompanying Issues and Decision Memorandum (Korea) at 15 (emphasis added). Thus, Commerce's (flawed-to-begin-with) analysis placed improperly determinative weight on the R&D factor, elevating it above the other factors in a manner that contradicts agency precedent that established that R&D is a comparatively less important "minor or significant" factor.

### E. Commerce's Analysis of Investment Data on an Absolute Basis was Distortive and Unlawful

Section 781 of the Act directs Commerce to take into account the "level of investment in {Cambodia}," as part of its analysis of whether

the process undertaken in Cambodia is "minor or insignificant."

19 U.S.C. § 1677j(b)(2)(A). The legislative history of the Tariff Act

explains that "Commerce will evaluate each of the factors under Section

781(b)(2)(A)-(E) of the Act as they exist either in the United States or a

third country, depending on the particular circumvention scenario."

SAA at 893. Commerce's investment comparison, in particular, is based

on the record of a given case. *Certain Cold-Rolled Steel Flat Products*

*from the People's Republic of China*, 83 Fed. Reg. 23,891 (Dep't

Commerce May 23, 2018) (affirmative final determination of

circumvention of the antidumping duty and countervailing duty orders),

and accompanying Issues and Decision Memorandum.

In the *Final Determination*, Commerce elected to compare the

level of investment in Cambodia and the level of investment of BYD

HK's Chinese affiliates on an absolute basis (*i.e.*, total value of

investments made) rather than on a per-megawatt basis (*i.e.*, value of

the investments relative to production). This approach was both

unreasonable and highly distortive in that it failed to take into account

the vastly smaller market served by the Cambodian operations as

compared to BYD HK's Chinese affiliates, who serve the very large

Chinese and global markets. As explained in detail below, this resulted

in a heavily distortive comparison which was contrary law.

Commerce argued in its final analysis memorandum that a per-

unit approach to the investment comparison is inappropriate because

the "threshold investment in the Chinese facilities . . . would . . . be

ignored." *Final IDM* at 18, Appx1213. This is wrong. Calculating on a

per-unit basis (*i.e.*, investment value divided by production) does not in

any way "ignore" investment amounts. The entirety of the investment

amounts is fully taken into account in the comparison. The difference is

that comparing investment levels at an absolute level, as Commerce has

insisted on doing, ignores the very different scales of production in the

two countries. The Chinese industry has invested in a large upstream

industry that supplies virtually all of the world's demand for polysilicon

wafers, whereas the Cambodian industry is manufacturing cells and

modules for the U.S. and (relatively small amounts) for certain other

markets. *Final IDM* at 17, Appx1212. The circumvention inquiry was

focused on the relative contributions of investments made to the

manufacture of the products in the two countries. By ignoring the size

of the markets served and crudely comparing investment levels on an absolute basis, Commerce created a severely distorted comparison.

Commerce sought to defend the basis for its comparison by complaining that Chinese producers, by investing in the upstream processes, have achieved economies of scale and lower per-unit costs. *Final IDM* at 19, Appx1214. While this may be true, it is not clear in what way this fact would render a per-unit comparison "distorted" or would "dilute" the Chinese costs. The objective, again, is for Commerce to compare the processes performed in China to the processes performed in Cambodia to produce the products exported to the United States. The fact that Chinese producers may have achieved lower costs in the earlier stages of that process through economies of scale has no relevance to that comparison and has no valid role in shaping the analysis.

As the respondents argued to Commerce during the circumvention proceeding, the only reasonable basis for comparing levels of investment is at a per-unit level. Only at a per-unit level can Commerce properly evaluate the extent to which investments at each stage of production are attributable to the merchandise under consideration. Commerce's

failure to take this approach meant that Commerce grossly exaggerated the level of investment in China attributable to the solar cells and modules processed in Cambodia. This, in turn, tainted Commerce's consideration of whether the processing in Cambodia was "minor or insignificant."

### F. Commerce Improperly Used Surrogate Values to Value Chinese Inputs Consumed in Cambodia

As summarized above, the statute directs Commerce to take into account, in determining whether there is circumvention, "the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the value of the merchandise that was exported to the United States." 19 U.S.C. § 1677j(b)(1)(D). In analyzing this statutory factor, Commerce used surrogate values rather than the respondent's purchase prices to value Chinese-produced inputs that were used to produce solar cells and modules in the inquiry country. *Final IDM* at 45, Appx.1240.

In the circumvention inquiry, Commerce collected data on the value of inputs used in production in Cambodia. BYD HK reported complete cost information for Chinese inputs that were consumed through the Cambodian manufacturing operation that reflected the actual purchase

value of raw materials into the Cambodian market. *See* Response from Hogan Lovells US LLP to the U.S. Department of Commerce, *2022 Circumvention Inquiry of Antidumping Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Response to Third Supplemental Questionnaire*, Case No. A-570-979 (Anti-circumvention Inquiry, Cambodia–2022) (Oct. 12, 2022) at Exhibits S3-3-A and S3-3-B, C.R. 162-164, Appx9573–9654. Commerce did not dispute the accuracy of this data. Nevertheless, rather than using this actual cost information from BYD HK's cost records, Commerce elected to instead use "surrogate values" for all Chinese inputs (*i.e.*, values for the same or similar types of inputs imported by other parties into third country markets) as derived under Commerce's NME authority. *Final IDM* at 45, Appx.1240.

It is undisputed that Cambodia is a market economy. There is therefore no evident factual or statutory basis for Commerce to have used an NME surrogate value methodology in this case. Moreover, by adopting this NME methodology, Commerce unlawfully overstated the value of Chinese inputs by utilizing inflated "surrogate values" to

account for the value of Chinese inputs, rather than the lower actual

cost of the inputs. 8/

In defense of this methodology, Commerce argued that neither the

statute nor Commerce's regulations describe how to determine "value"

for this purpose. Commerce claims that it chose to value the inputs

based on their "cost" and therefore looked for "instruction" in the

statutory provisions for determining cost of production and constructed

value under 19 U.S.C. § 1677b(f)(1). Those provisions require Commerce

"normally" to use the costs as recorded in the books and records of the

respondent if such costs are kept in accordance with generally accepted

accounting principles of the exporting country and "reasonably reflect

costs associated with the production and sale of the merchandise." *Final

IDM* at 45 (citing 19 U.S.C. § 1677b(f)(1). According to Commerce:

> Under the Act, the prices of goods produced in
> NME countries cannot generally be relied upon.
> The presence of government controls on various
> aspects of NMEs renders calculation of costs
> based on actual prices paid for NME inputs
> invalid under Commerce's normal methodologies.
> Because the respondent assembled solar modules

---

[8]    *See BYD HK Prelim. Analysis Mem.* at 4 under heading "Whether
the value of the processing performed in Cambodia represents a small
proportion of the value of the merchandise imported into the United
States."

in the inquiry country using inputs that were
produced in China, and China is an NME
country, we believe the prices paid by the
respondent could be distorted by controls in the
NME country. Given these facts, we find it would
be inappropriate to use the respondent's records
to determine the cost of the Chinese-produced
inputs.

*Final IDM* at 45, Appx1240. Based on these assertions, Commerce

chose surrogate values as an alternative basis to determine the value of

inputs. Commerce further asserted that this methodology is consistent

with International Trade Administration Policy Bulletin 94.1, which

sets out Commerce's presumption that prices of NME-produced goods

sold to third country resellers are likely distorted by state controls. *Id*.

Commerce also claims that this approach was sustained by the CIT in

*Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (Ct.

Int'l Trade 2021).

Commerce's application of the NME methodology in the context of

this case cannot be squared with the statute or the facts. To begin with,

Policy Bulletin 94.1 is not at all analogous. The issue addressed in

Policy Bulletin 94.1 was the determination of normal value ("NV")

based on sales of the merchandise under consideration (*i.e.*, finished

goods completed in an NME country) by third country resellers, not

input costs. By contrast, the values at issue here are values of *inputs* used to manufacture subject merchandise not values for the merchandise under consideration. These inputs include globally traded goods such as polysilicon wafers and aluminum. Similarly, while the Court of International Trade has upheld the use of surrogate values in the circumvention context the issue has, to our knowledge, never been addressed by the Federal Circuit. Those opinions also predate the Supreme Court's decision in *Loper*. *See generally Loper*. Review of Commerce's methodology under *Loper* would require the Court of International Trade to find that Commerce's interpretation of the statute is the "best" one, and not merely "permissible"—a much different analysis. *Id*. at 23.

In any event, Commerce's analysis is ultimately unlawful because Commerce failed to substantiate the factual premise for departing from BYD HK's actual books and records. That premise is that the actual purchase values in those books do not "reasonably reflect the costs associated with the production and sale of the merchandise." Final I&D Mem. at 44, Appx1239. In the place of substantial evidence to support this distortion theory, Commerce offers only generalized conjecture that

the prices for Chinese inputs sold in the Cambodian market economy must be distorted by "state control" and "the absence of market directed decisions on price and cost." *Id.* at 44-45, Appx1239-1240. However, the Chinese Government exercises no state control over Cambodia's market economy and Commerce has identified no evidence to the contrary. Moreover, if any presumptions should apply in this case, the presumption must be that prices for sales to the Cambodian market (a market economy) are determined by market factors, not the Chinese Government. Certainly, the substantial evidence standard requires, at a minimum, that Commerce identify particularized evidence to support a contrary conclusion, and Commerce's references to an inapposite Policy Bulletin and court decisions that have not been reviewed by the Court of Appeals cannot stand in the place of such evidence.

The circumvention inquiry at issue here is a market economy case and subject to market economy rules. Those rules require Commerce to adhere to the books and records of the respondent unless there is reason to conclude that those prices and costs in those books do not reasonably reflect the cost associated with production and sale of the merchandise. Commerce has failed to identify any particularized evidence that the

prices of Chinese inputs in the Cambodian market are distorted and has

failed to identify any law or regulation that authorizes the application

of NME methodologies outside the context of an NME proceeding. This

matter should be remanded to Commerce with instructions to use the

actual purchase values reported by BYD HK.

### G. Commerce Failed to Demonstrate that an Affirmative Finding of Circumvention Is "Appropriate" within the Meaning of the Statute

In the *Final Determination*, Commerce ultimately concluded that

it was "appropriate" to expand the AD/CVD orders to apply to imports

from Cambodia. In explaining its determination, Commerce stated that

the agency "determined the process of assembly or completion in

Cambodia to be minor or insignificant, and therefore a finding that

solar cells and modules produced in Cambodia are circumventing the

Orders is appropriate." *Final IDM* at 72, Appx1267. Commerce asserted

that expansion of the orders to include exports from Cambodia and the

other countries is therefore "appropriate" in order to "prevent evasion of

such order or finding." *Id*. at 76. As explained below, the statute directs

Commerce to conduct an *independent* analysis of whether application of

the measures is "appropriate." By merely parroting its analysis of the

statutory factors, Commerce's finding with respect to appropriateness was therefore not in accordance with law.

Again, the statutory text is determinative. For Commerce to reach an affirmative circumvention finding, the statute requires Commerce not only to address the "minor or insignificant" processing factors discussed above, but also plainly states that Commerce is required to "determine{} that action *is appropriate* . . . to prevent evasion of such order or finding." 19 U.S.C. § 1677j(b)(E) (emphasis added). This directive is contained in a separate clause in the statute and is not simply consequential to consideration of the preceding factors. Commerce's treatment of this factor as merely a consequence of its analysis of the preceding factors therefore unlawfully renders a statutory factor as mere surplusage. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) (explaining that the canon against surplusage suggests that the court will reject interpretation of a statute where that interpretation would "render superfluous another part of the same statutory scheme"). The statute has isolated the appropriateness finding requirement for a purpose and it cannot simply be waived by Commerce. This Court should favor the only permissible interpretation

of the statute and one that gives effect to all of its provisions: that the appropriateness standard is an independent statutory factor that requires Commerce to weigh the evidence and provide reasoning as to why an affirmative determination is "appropriate," under Section 1677j(b)(1)(E), separate from its minor or insignificant findings under Section 1677j(b)(1)(C). *See United States v. Menasche*, 348 U.S. 528, 538–539 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'") (*quoting Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)); *Loper*, 503 U.S. at 23 ("In the business of statutory interpretation, if it is not the best, it is not permissible.").

Commerce's failure to conduct the required separate "appropriateness" analysis was also not a harmless error. Neither the statute nor the SAA provides a specific definition of "appropriate" to be applied in the circumvention context. 19 U.S.C. § 1677j(b); *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,327–330 (Dep't Commerce May 19, 1997) (final rule). Notwithstanding, the Supreme Court has explained that whether federal agency action is "appropriate" hinges on whether the agency has demonstrated its consideration of "all the relevant factors," and pays "at least some attention to cost." *Michigan*

71

*v. EPA*, 576 U.S. 743, 752 (2015) (citation omitted). The Supreme Court has further indicated that "{n}o regulation is 'appropriate' if it does significantly more harm than good." *Id*. Affirmative determinations of circumvention were not "appropriate" here.

Commerce effectively ignored the multiple additional serious considerations raised by the parties arguing against application of the finding. Indeed, the inappropriateness of the circumvention finding is perhaps nowhere more starkly evidenced than by the President's unprecedented intervention in the proceeding to prevent application of the duties for a two-year period. *See generally* Proclamation 10414. Clearly the President did not see expansion of the scope of the *Solar I* Orders to cover Southeast Asia was appropriate.

Moreover, multiple parties raised other concerns undercutting the appropriateness of the circumvention finding. Not least of these is that Commerce had repeatedly expressly affirmed that cells manufactured in a third country were intended to be excluded from the *Solar I* Orders. Expansion of the scope of the *Solar I* Orders to cover this very same category of products upended a decade of precedent on which the

industry had come to rely, thrusting uncertainty onto parties that had invested in manufacturing in Southeast Asia.

This scope expansion ignores and contradicts the Department's longstanding precedents regarding the nature and significance of vital processes in the production of CSPV solar cells and modules. Commerce previously confirmed that it is inappropriate to conduct a circumvention inquiry where merchandise was "expressly and intentionally excluded from the scope of the Orders," as was the case here. *See Certain Walk-Behind Lawn Mowers and Parts Thereof From the People's Republic of China*, 88 Fed. Reg. 13,434 (Dep't Commerce Mar. 3, 2023) (notice of intent to rescind circumvention inquiry on the antidumping and countervailing duty orders) (explaining, in a case regarding merchandise assembled in the United States, "We find that the inquiry merchandise is excluded from the scope of the orders . . . We also find that it is *not appropriate* to conduct a circumvention inquiry on such excluded merchandise.") (emphasis added).

As noted above, Commerce itself indicated in its original *Solar I* investigation that converting Chinese-origin wafers into CSPV cells in a third country would not warrant circumvention inquiries. Commerce

stated: "*Petitioner has the option of bringing additional petitions* to address any dumping concerns it has *regarding solar modules/panels assembled from solar cells produced in a third country*." NextEra Comments at Att. 13, Appx13235–13246 (emphasis added). Yet Commerce simply retreats from its previous assurances by contending that in "the {*Solar I*} investigation, we stated that there was the option for bringing additional petitions regarding assembly of solar cells and modules in a third country, but did not prelude circumvention inquiries." *Final IDM* at 76, Appx1271.

As noted elsewhere, significant investments were made in Cambodia and elsewhere in reliance on Commerce's stated position on this issue. Particularly in the absence of any pretense of making a case that the imports at issue have or will cause material injury to the domestic industry, Commerce was required to consider the appropriateness of abandoning its established position on the scope of the orders.

Accordingly, Commerce's failure to address this key deficiency in its *Final Determinations* render the agency's *Final Determinations* both

unsupported by substantial evidence and otherwise not in accordance with law.

## V.    CONCLUSION

For the foregoing reasons, BYD HK respectfully requests that the Court grants BYD HK's Motion for Judgment on the Agency Record. BYD HK respectfully requests that this Court remand to Commerce with instructions to redetermine the circumvention determination with respect to BYD HK consistent with the arguments set forth above.

Respectfully submitted,

/s/ Craig A. Lewis
Craig A. Lewis
Nicholas W. Laneville
Gregory M.A. Hawkins

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910
E-mail: craig.lewis@hoganlovells.com

*Counsel to BYD (HK) Co., Ltd.*

Dated: July 2, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Standard Chambers Procedure section 2(B)(1), the undersigned counsel at Hogan Lovells US LLP hereby certifies that this Memorandum in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record complies with the word-count limitation requirement. The memorandum of law contains 13,956 words according to the word-count function of the word-processing software used to prepare the Memorandum.

Respectfully submitted,

/s/ Craig A. Lewis
Craig A. Lewis

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.5600
Fax: +1.202.637.5910
E-mail: craig.lewis@hoganlovells.com

*Counsel to BYD (HK) Co., Ltd.*

Dated: July 2, 2024

# CERTIFICATE OF SERVICE

I, Craig A. Lewis, hereby certify that copies of the attached public submission have been served by the Court's CM/ECF system, on July 2, 2024, addressed to the following parties:

Stephen C. Tosini

U.S. DEPARTMENT OF JUSTICE
Commercial Litigation Branch -
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Phone: +1.202.616.5196
Email: stephen.tosini@usdoj.gov

*Counsel to Defendant the United States*

Thomas M. Beline

CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Avenue, NW.
Suite 300
Washington, DC 20037
Phone: +1.202.567.2316
Email: tbeline@cassidylevy.com

*Counsel to Defendant–Intervenor Auxin Solar Inc.*

Matthew R. Nicely

AKIN, GUMP, STRAUSS, HAUER &
FELD, LLP
2001 K Street, NW.
Washington, DC 20006-1037
Phone: +1.202.887.4046
Email: mnicely@akingump.com

*Counsel to Plaintiff–Intervenor Florida Power & Light Company*