THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____
                                          )
BYD (H.K.) CO., LTD.,                     )
                                          )
    Plaintiff,                            )
                                          )
    and                                   )
                                          )
FLORIDA POWER & LIGHT CO.,                )
                                          )
    Plaintiff-intervenor,                 )
                                          )
    v.                                    )    Court No. 23-00221
                                          )
UNITED STATES,                            )
                                          )
    Defendant,                            )
                                          )
    and                                   )
                                          )
AUXIN SOLAR INC. ET ANO,                  )
                                          )
    Defendant-intervenors.                )
_____ )

DEFENDANT'S OPPOSITION TO PLAINTIFF'S AND PLAINTIFF-
INTERVENOR'S MOTIONS FOR JUDGMENT ON THE
<u>ADMINISTRATIVE RECORD</u>

<div align="right">

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, Jr.
Assistant Director

</div>

OF COUNSEL:
Spencer C. Neff
Attorney
Office of Chief Counsel for
   Trade Enforcement and
   Compliance
Department of Commerce

STEPHEN C. TOSINI
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480,
Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 616-5196
Email: stephen.tosini@usdoj.gov

October 29, 2024

Attorneys for Defendant

# TABLE OF CONTENTS

PAGE

STATEMENT PURSUANT TO RULE 56.2 ...................................................... 1

    I.    Administrative Determination Under Review .............................. 1

    II.   Issues Presented For Review ......................................................... 2

STATEMENT OF FACTS

    I.    Legal Framework For Circumvention Inquiries Under 19 U.S.C. § 1677j(b) ..................................................................................... 3

    II.   Background And Initiation Of Circumvention Proceeding ........... 6

    III.  Preliminary Determination ............................................................ 7

    IV.  Final Determination ..................................................................... 11

ARGUMENT ................................................................................................... 11

    I.    Standard Of Review ..................................................................... 11

    II.   BYD's Production Process In Cambodia Was Minor Or Insignificant ................................................................................ 12

          A.    Commerce Reasonably Placed Particular Emphasis On R&D ...................................................................................... 13

          B.    Commerce Reasonably Considered The Statutory Factors for Determining "Minor Or Insignificant" ......................... 15

    III.  Commerce's Determination Not To Consider The Activities Of BYD's Unaffiliated Tollers Is Supported By Substantial Evidence ..................................................................................................... 17

    IV.  The Value Added In Cambodia By BYD's Tollers Was Small ..... 23

    V.   BYD's Level Of Investment Was Minor ...................................... 29

VI.    Commerce Lawfully Used Surrogate Values For Chinese
Inputs.................................................................................................. 31

VII.   Commerce's Finding That Action Was Appropriate Under The
Statute To Prevent Evasion Is Supported By Substantial
Evidence ........................................................................................... 33

CONCLUSION ................................................................................................. 37

PAGE(S)

<u>CASES</u>

*Al Ghurair Iron & Steel LLC v. United States*,
   536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021),
   *aff'd*, 65 F.4th 1351 (Fed. Cir. 2023).......................................................passim

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ..................................................... 12

*Bell Supply Co., LLC v. United States*,
   888 F.3d 1222 (Fed. Cir. 2018) ..................................................... 34

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ..................................................................... 12

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*,
   Inv. No. TA-201-075 ...................................................................... 8

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ..................................................................... 35

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ...................................................... 11

*Goldlink Indus. Co. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ............................... 12

*HLDS (B) Steel SDN BHD v. United States*,
   No. 21-00638, 2024 WL 244937 (Ct. Int'l Trade Jan. 23, 2024) ........... 16, 33

*Hyundai Elec. & Energy Sys. Co. v. United States*,
   15 F.4th 1078 (Fed. Cir. 2021)..................................................... 25

*INS v. Elias-Zacarias*,
   502 U.S. 478 (1992) ..................................................................... 12

*Lignite Energy Council v. United States EPA,*
198 F.3d 930 (D.C. Cir. 1999) ........................................................ 5

*Nielsen v. Preap,*
586 U.S. 392, 139 S. Ct. 954 (2019) ............................................ 25

*Save Domestic Oil, Inc. v. United States,*
357 F.3d 1278 (Fed. Cir. 2004) .................................................... 25

*U.K. Carbon and Graphite Co., Ltd. v. United States,*
931 F. Supp. 2d 1322 (Ct. Int'l Trade 2013) .............................. 32

*United States v. Eurodif S.A.,*
555 U.S. 305 (2009) ...................................................................... 12

STATUTES

19 U.S.C. § 1516a(b)(1)(B) ............................................................ 11

19 U.S.C. § 1677(18) ................................................................ 31, 32

19 U.S.C. § 1677(b) ....................................................................... 25

19 U.S.C. § 1677(b)(1)(B) ............................................................... 5

19 U.S.C. § 1677(b)(2) ..................................................................... 9

19 U.S.C. § 1677b(f)(1) ............................................................ 31, 32

19 U.S.C. § 1677j(b)(1) ................................................................ 3, 4

19 U.S.C. § 1677j(b)(1)(B) ............................................................. 5

19 U.S.C. § 1677j(b)(1)(C) ....................................................passim

19 U.S.C. § 1677j(b)(1)(D) ..................................................... 31, 32

19 U.S.C. § 1677j(b)(1)(E) ..................................................... 33, 35

19 U.S.C. § 1677j(b)(2) .........................................................passim

19 U.S.C. § 1677j(b)(2)(A) ..........................................................................passim

19 U.S.C. § 1677j(b)(2)(B) .............................................................. 17, 26

19 U.S.C. § 1677j(b)(2)(C) .............................................................. 24, 26

19 U.S.C. § 1677j(b)(2)(D) .............................................................. 17, 26

19 U.S.C. § 1677j(b)(2)(E) ..........................................................................passim

19 U.S.C. § 1677j(b)(3) ..........................................................................passim

19 U.S.C. § 1677j(b)(3)(B) ................................................................... 19

42 U.S.C. § 7411(a)(1) ............................................................................ 5

## REGULATIONS

19 C.F.R. § 351.225(h) ........................................................................... 5
19 C.F.R. § 351.226(i) ............................................................................ 4

## ADMINSTRATIVE DETERMINATIONS

*Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*,
   H.R. Doc. No. 103-316 (SAA), at 893 (1994), reprinted in 1994
   U.S.C.C.A.N. 4040 ............................................................................ 5

*Omnibus Trade Act of 1987, Report of the Senate Finance Committee*,
   S. Rep. No. 100-71 (S. Rep.), at 101 (1987) ..................................... 6

*Conference Report Accompanying The Omnibus Trade And Competitiveness Act Of 1988*,
   Pub. L. No. 100-418, 102 Stat. 1107 (1988) .......................................... 26, 34

*Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom*,
   64 Fed. Reg. 40,336, 40,347 (Dep't Commerce Jul. 26, 1999) ........ 23, 27, 28

*Certain Pasta From Italy,*
   68 Fed. Reg. 46,571, 46,575 (Dep't Commerce Aug. 6, 2003) .................... 24

*Certain Tissue Paper Products From The People's Republic Of China,*
   73 Fed. Reg. 21,580, 21,585-86 (Dep't Commerce Apr. 22, 2008) ........ 27, 28

*Ferrovanadium And Nitrided Vanadium From The Russian Federation,*
   77 Fed. Reg. 6,537, 6,539 (Dep't Commerce Feb. 8, 2012).................... 27, 28

*Small Diameter Graphic Electrodes From The People's Republic Of China,*
   77 Fed. Reg. 33,405, 33,413 (Dep't Of Commerce Jun. 6, 2012) ............... 24

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,*
   77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012)................................. 6

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China,*
   77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012)................................. 6

*Certain Corrosion-Resistant Steel Products From Taiwan,*
   84 Fed. Reg. 32,864 (Dep't Commerce July 10, 2019)................................. 24

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,*
   87 Fed. Reg. 19,071 (Dep't of Commerce Apr. 1, 2022)................................. 7

*Declaration Of Emergency And Authorization For Temporary Extensions Of Time And Duty-Free Importation Of Solar Cells And Modules From Southeast Asia,*
   87 Fed. Reg. 35,067 (June 9, 2022) ....................................................... 35, 36

*Certain Welded Carbon Steel Standard Pipes and Tubes from India,*
   87 Fed. Reg. 52,507 (Dep't Commerce Aug. 26, 2022) ............................... 14

*Stainless Steel Sheet and Strip from the People's Republic of China,*
   87 Fed. Reg. 56,626 (Dep't of Commerce Sept. 15, 2022) ........................... 20

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,*
　87 Fed. Reg. 75,221 (Dep't of Commerce Dec. 8, 2022)................................ 7

*Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan,*
　88 Fed. Reg. 21,980 (Dep't Commerce Apr. 12, 2023)................................ 14

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,*
　88 Fed. Reg. 57,419 (Dep't of Commerce Aug. 23, 2023) ......................... 1, 7

THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____
)
BYD (H.K.) CO., LTD.,                                      )
)
     Plaintiff,                                              )
)
     and                                                    )
)
FLORIDA POWER & LIGHT CO.,                      )
)
     Plaintiff-intervenor,                          )
)
     v.                                                        )     Court No. 23-00221
)
UNITED STATES,                                            )
)
     Defendant,                                            )
)
     and                                                    )
)
AUXIN SOLAR INC. ET ANO,                        )
)
     Defendant-intervenors.                       )
_____ )

## ORDER

On consideration of plaintiff's and plaintiff-intervenor's motions for judgment on the administrative record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the motions are denied and, it is further

ORDERED that judgment is entered for the United States.


Dated:_____                    _____
        New York, N.Y.                              JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____
                                                    )
BYD (H.K.) CO., LTD.,                               )
                                                    )
    Plaintiff,                  )
                                                    )
    and                         )
                                                    )
FLORIDA POWER & LIGHT CO.,                          )
                                                    )
    Plaintiff-intervenor,       )
                                                    )
    v.                          )          Court No. 23-00221
                                                    )
UNITED STATES,                                      )
                                                    )
    Defendant,                  )
                                                    )
    and                         )
                                                    )
AUXIN SOLAR INC.,                                   )
                                                    )
    Defendant-intervenor.       )
_____ )

DEFENDANT'S OPPOSITION TO PLAINTIFF'S AND PLAINTIFF-
INTERVENOR'S MOTIONS FOR JUDGMENT ON THE
<u>ADMINISTRATIVE RECORD</u>

Defendant, the United States, respectfully submits this response in

opposition to the motions for judgment on the administrative record filed by

plaintiff, BYD (H.K.) Co., Ltd. (BYD), and by plaintiff-intervenor, Florida

Power & Light Company (Florida Power). ECF No. 37 (BYD Br.); ECF No. 38

(Florida Power Br.). The Court should sustain the final determination because it is supported by substantial evidence and in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

I.  Administrative Determination Under Review

The administrative determination under review is the final determination of circumvention of the antidumping and countervailing duty orders on solar cells from China, issued and published as *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 88 Fed. Reg. 57,419 (Dep't of Commerce Aug. 23, 2023) (final determination of circumvention) (*Final Determination*), and the Issues and Decision Memorandum with respect to Cambodia (IDM) (Appx1196-1363).

II.  Issues Presented For Review

1.  Whether Commerce's determination that the production process in Cambodia, after taking into consideration the five statutory factors, is minor or insignificant is supported by substantial evidence and in accordance with law.

2.  Whether Commerce's determination not to consider the production activities of BYD's unaffiliated tollers as part of its analysis of the production process in Cambodia is supported by substantial evidence and in accordance with law.

2

3. Whether Commerce's finding that the value added in Cambodia by BYD is small is supported by substantial evidence.

4. Whether Commerce's determination that the level of investment for BYD was minor is supported by substantial evidence.

5. Whether Commerce's determination to rely on surrogate values for its calculation of the value of Chinese production as a proportion of the value of exported merchandise is supported by substantial evidence and in accordance with law.

6. Whether Commerce's determination that a finding of circumvention was necessary to prevent circumvention of the antidumping and countervailing duty orders on solar cells from China is supported by substantial evidence.

## STATEMENT OF FACTS

I. Legal Framework For Circumvention Inquiries Under 19 U.S.C. § 1677j(b)

To prevent circumvention of antidumping and countervailing duty orders, Commerce may include within the scope of an order merchandise completed in a foreign country other than the order country if

(A) {the} merchandise imported into the United States is of the same class or kind as any merchandise produced in a foreign country that is the subject of {an order},

(B) before importation into the United States, such imported merchandise is completed or assembled in another foreign

country from merchandise which . . . is subject to the order . . . or . . . produced in a foreign country . . . to which such order . . . applies,

(C) the process of assembly or completion in the foreign country . . . is minor or insignificant,

(D) the value of the merchandise produced in the foreign country . . . is a significant portion of the total value of the merchandise exported to the United States, and

(E) action is appropriate . . . to prevent evasion of such order.

19 U.S.C. § 1677j(b)(1); *see also* 19 C.F.R. § 351.226(h) (explaining that Commerce "may include within the scope of an antidumping or countervailing duty order, at any time such order is in effect, imported merchandise completed or assembled in a foreign country other than the country to which the order applies").

In determining whether the process of assembly or completion in the third country is "minor or insignificant" under 19 U.S.C. §1677j(b)(1)(C), the statute directs Commerce to "take into account"

(A) the level of investment in the foreign country,

(B) the level of research and development in the foreign country,

(C) the nature of the production process in the foreign country,

(D) the extent of the production facilities in the foreign country, and

(E) whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

19 U.S.C. § 1677j(b)(2).  No single factor controls.  19 C.F.R. § 351.225(h);

Statement of Administrative Action Accompanying the Uruguay Round

Agreements Act, H.R. Doc. No. 103-316 (SAA), at 893 (1994), *reprinted in*

1994 U.S.C.C.A.N. 4040.  Additionally, when Congress has prescribed factors

but not their relative weight, the agency is granted "a great degree of

discretion in balancing them."  *Lignite Energy Council v. United States EPA*,

198 F.3d 930, 933 (D.C. Cir. 1999) (holding that the Environmental

Protection Agency was granted discretion to balance factors in 42 U.S.C. §

7411(a)(1) because no one factor was controlling).

The statue identifies additional, non-exhaustive, discretionary factors

to consider in weighing whether to find circumvention.  Commerce thus will

"take into account such factors as --"

> (A) the pattern of trade, including sourcing patterns,
>
> (B) whether the manufacturer or exporter of the merchandise . . .
> described in {19 U.S.C. § 1677j(b)(1)(B)} is affiliated with the
> person who uses the merchandise described in {19 U.S.C.
> § 1677j(b)(1)(B)} to assemble or to complete in the foreign country
> the merchandise that is subsequently imported into the United
> States; and
>
> (C) whether imports into the foreign country of the merchandise
> described in {19 U.S.C. § 1677(b)(1)(B)} have increased after the
> initiation of the investigation that resulted in the issuance of
> such order.

19 U.S.C. § 1677j(b)(3).

Congress "authorize{d} {Commerce} to apply . . . orders in such a way as to prevent circumvention and diversion of U.S. law." Omnibus Trade Act of 1987, Report of the Senate Finance Committee, S. Rep. No. 100-71 (S. Rep.), at 101 (1987). Commerce thus possesses "substantial discretion in interpreting these terms, and invoking these measures, so as to allow it flexibility to apply the provisions in an appropriate matter . . . {and to} use {its} authority "to the fullest extent possible to combat diversion and circumvention of the antidumping and countervailing duty laws." *Id.* at 100.

II.    Background And Initiation Of Circumvention Proceeding

Commerce issued antidumping and countervailing duty orders on solar products from China. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012) (collectively *Solar Orders*).

Auxin Solar Inc. (Auxin), a domestic producer of solar modules, requested that Commerce initiate a circumvention inquiry to determine whether solar cells and modules from four countries (Cambodia, Malaysia, Thailand, and Vietnam) that use parts and components from China are circumventing the *Solar Orders*. Request for Anti-Circumvention Inquiry

(Feb. 18, 2022) (P.R. 1-19/C.R. 1-20) (Circumvention Request) (Appx1401).

Commerce initiated the requested inquiry. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 19,071 (Dep't of Commerce Apr. 1, 2022) (Initiation).

Commerce selected BYD and New East Solar (Cambodia) Co., Ltd. (NE Solar)[1] as mandatory respondents, finding that they were the largest producers/exporters of solar cells from Cambodia. Respondent Selection Memo (May 12, 2022) (P.R. 185/C.R. 41) (RSM) at 7 (Appx3958).

III.    Preliminary Determination

Commerce preliminarily found that circumvention was occurring through Cambodia on a country-wide basis. *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 75,221 (Dep't of Commerce Dec. 8, 2022) (Prelim. Circ. Det.) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum for Cambodia (PDM) (Appx1015-40).

Commerce described the general production process for solar modules in four steps. First, raw polysilicon is heated, melted, and cooled to form a

_____

[1]    NE Solar refused to cooperate at verification and thus Commerce found circumvention pursuant to its adverse facts available (AFA) authority. *Final Determination,* 88 Fed. Reg. at 57,420. NE Solar's circumvention is not at issue in this case.

polysilicon ingot.  PDM at 15-16 (Appx1029-30) (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*, Inv. No. TA-201-075, Publication 5021 (Feb. 7, 2020) (*ITC Report*) at I-62).  Second, the ingot is sliced, typically using a diamond wire saw, into polysilicon wafers.  *Id.* at 16 (Appx1030) (citing *ITC Report* at I-64).  Third, polysilicon wafers undergo several chemical treatments, including the formation of a positive-negative (p/n) junction, which converts the polysilicon wafers into solar cells.  *Id.* (citing *ITC Report* at I-65-I-66).  Commerce explained that the formation of the p/n junction is the step of the production process at which the solar cell is capable of converting sunlight into electricity and thus defines a cell's country of origin.  *Id.* at 17-18 (Appx1031-32).  Fourth, solar cells are soldered into strings and placed onto a layer of solar glass and ethyl vinyl acetate (EVA) and covered by another layer of EVA and backsheet.  The solar cells are then cured and encased in aluminum frames, and a junction box is attached to create a finished solar module.  *Id.* at 16 (Appx1030) (citing *ITC Report* at I-67).

Commerce found that BYD did not directly engage in the production of solar cells in Cambodia but, rather, relied on processing arrangements with unaffiliated tollers, for whom BYD obtained China-origin solar wafers from its Chinese affiliate and certain other raw materials from China.  *Id.* at 11-12 (Appx1025-26).  BYD then acted as the exporter of the merchandise

completed by the tollers. *Id.* at 11 (Appx1025). Commerce concluded that those parts and inputs are a significant portion of the total value of the completed solar modules exported by BYD. *Id.* at 19 (Appx1033). In carrying out its calculation of the value of the Chinese inputs as a proportion of the overall value of the completed solar modules, Commerce employed a surrogate value methodology because the order country (China) is a non-market economy. *Id.* at 7-9 (Appx1021-23).

Commerce then determined that the process of assembly or completion of solar cells by BYD in Cambodia was minor or insignificant. *Id.* at 22 (Appx1036). Commerce evaluated the five factors identified in 19 U.S.C. § 1677(b)(2) with respect to production in Cambodia: (A) the level of investment; (B) the level of research and development (R&D); (C) the nature of the production process; (D) the extent of the production process; and (E) the value added as a proportion of the total value of BYD's U.S. exports of solar cells and modules.

First, under section 1677j(b)(2)(A), Commerce found that BYD did not invest in the production of solar cells, and therefore that its level of investment in Cambodia was minor or insignificant when compared to its affiliated Chinese producers. *Id.* at 14 (Appx1028). For this factor, and for the level of R&D and extent of the production facilities factors, Commerce did not consider the activities of BYD's unaffiliated tollers in its analysis. *Id.*; *see*

*also* IDM at 50-52 (Appx1245-47) (further explaining Commerce's determination not to consider BYD's unaffiliated tollers in the minor or insignificant analysis).

Second, turning to subparagraph (B), Commerce found that BYD did not carry out any R&D in Cambodia, and therefore that BYD's level of R&D in Cambodia was minor or insignificant when compared to the R&D incurred by its affiliates in China. *Id.* at 15 (Appx1029).

Third, under subparagraph (C), Commerce found that the nature of BYD's production process for solar cells and solar modules was not minor or insignificant when compared to the production process for polysilicon ingots and solar wafers. *Id.* at 15-18 (Appx1029-32).

Fourth, under subparagraph (D), Commerce found that BYD did not maintain production facilities in Cambodia, and thus that the extent of BYD's production facilities was minor or insignificant when compared to its Chinese affiliates' production facilities. *Id.* at 18 (Appx1032).

Fifth, turning to subparagraph (E), Commerce found that the value of processing carried out by BYD in Cambodia represented a small proportion of the total value of each company's exports of solar cells to the U.S. *Id.* at 19 (Appx1033); *see also* Preliminary Analysis Memorandum for BYD (Dec. 2, 2022) (P.R. 424/C.R. 185) (BYD Prelim. Analysis) at 4 (Appx1003).

Commerce evaluated the totality of the five 19 U.S.C. § 1677j(b)(2) factors and concluded that the production process in Cambodia for BYD was minor or insignificant. *Id.* at 22 (Appx1036). Commerce explained that, for the purposes of its analysis, it had placed special emphasis on the level of R&D carried out in Cambodia because of the uniquely complex and research-intensive nature of solar cell and module production. *Id.*; *see also* IDM at 62 (Appx1257) (further explaining Commerce's determination to place particular emphasis on R&D).

As a result, taking into consideration the above findings as well as the three 19 U.S.C. § 1677j(b)(3) factors, Commerce preliminarily concluded that BYD circumvented the *Solar Orders*. PDM at 22 (Appx1036).

IV.    Final Determination

Commerce did not make significant changes to its overall circumvention finding and continued to find that BYD circumvented the *Solar Orders*. IDM at 9 (Appx1204).

ARGUMENT

I.    Standard Of Review

The Court sustains Commerce's determinations, findings, or conclusions unless they are unsupported by substantial evidence on the record, or otherwise unlawful. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). Indeed,

"{t}he specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). Substantial evidence connotes "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," taking into account the entire record. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (cleaned up). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions does not render findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). The Court will not substitute its judgment for Commerce's in choosing between two fairly conflicting views, even if it could "justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).

II.  <u>BYD's Production Process In Cambodia Was Minor Or Insignificant</u>

To find that merchandise assembled or completed in a third country circumvents, Commerce must find the third-country production process to be

minor or insignificant.  19 U.S.C. § 1677j(b)(1)(C).  The statute identifies five

factors that Commerce "shall take into account" but does not otherwise

instruct Commerce on how to evaluate the factors.  19 U.S.C. § 1677j(b)(2).

Commerce evaluates the factors "depending on the particular circumvention

scenario" and "{n}o single factor will be controlling."  SAA at 893.  Congress

recognized "the need for flexibility in administering this standard."  *Al

Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1375 n.5

(Ct. Int'l Trade 2021) (*Al Ghurair I*), *aff'd,* 65 F.4th 1351 (Fed. Cir. 2023) (*Al

Ghurair II*) (quoting S. Rep. 103-412 at 82).

A.     Commerce Reasonably Placed Particular Emphasis On R&D

In determining whether the production process for solar modules in

Cambodia was minor or insignificant, Commerce placed particular emphasis

on the level of R&D in Cambodia.  IDM at 62 (Appx1257).  Commerce set

forth uncontroverted record evidence to explain that R&D is particularly

important to solar producers, and that R&D has been key for technological

breakthroughs in the solar industry.  *Id.* (citing Circumvention Request at

Exhibit 4 (Appx1570-96); Auxin Investment Submission) at Exhibit 1 (P.R.

330) (Appx16989)).

BYD and FPL take issue with Commerce's weighing of the importance

of the R&D factor.  BYD Br. 56-59; FPL Br. 17-18.  BYD contends that

Commerce lacks authority to give one factor more weight than any other.

BYD Br. at 57-58.  But the SAA directs that Commerce will evaluate the

factors "depending on the particular circumvention scenario."  SAA at 893.

This language manifests congressional intent that Commerce should,

depending on the record facts before it, weigh certain factors over others.

That is what Commerce did, and Commerce articulated why the evidence on

the record supported its determination to emphasize R&D.

Moreover, Commerce did not accord "determinative status" to R&D.

BYD Br. at 57-58,  Commerce evaluated all five factors as part of its analysis.

IDM at 62 (Appx1257).  Commerce's finding that the production process in

Cambodia was minor or insignificant is supported by multiple factors:  BYD

did not incur any investment, R&D expenses, or maintain any production

facilities in Cambodia.  *Id.* at 61-67 (Appx1256-62).

BYD further asserts that Commerce's emphasis on R&D departs from

past circumvention determinations.  BYD Br. at 57-59 (citing *Certain Welded*

*Carbon Steel Standard Pipes and Tubes from India,* 87 Fed. Reg. 52,507

(Dep't Commerce Aug. 26, 2022) (prelim. circumvention det.), and

accompanying Issues and Decision Memorandum at 16; *Light-Walled Welded*

*Rectangular Carbon Steel Tubing from Taiwan*, 88 Fed. Reg. 21,980 (Dep't

Commerce Apr. 12, 2023) (prelim. circumvention det.), and accompanying

Issues and Decision Memorandum (*Steel Tubing from Taiwan PDM*) at 14)).

In both cases, Commerce found that R&D was not significant to those

industries.  Therefore, Commerce found that R&D was not an informative factor when evaluating circumvention for products in those industries.  *See, e.g.*, *Steel Tubing from Taiwan PDM* at 14 (finding that "a lack of significant {R&D} expenses with respect to {subject merchandise} does not necessarily mean that the processing in Vietnam is minor or insignificant.").  Commerce, however, appropriately did not draw the same conclusion in this case because the uncontroverted record evidence establishes that R&D is particularly important to solar production.  IDM at 62 (Appx1257).  By weighing the minor or insignificant factors according to the nature of the relevant industry and circumvention scenario, Commerce followed congressional intent.  SAA at 893.

> B.     Commerce Reasonably Considered The Statutory Factors for
>         Determining "Minor Or Insignificant"

Commerce evaluated the five 19 U.S.C. § 1677j(b)(1)(C) factors and, based on the totality of those factors, concluded that the production process in Cambodia for BYD was minor.  IDM at 61 (Appx1256).  Commerce found that three of the statutory factors (the level of investment, the level of R&D, and the extent of the production facilities) supported a finding that BYD's production in Cambodia was minor.  *Id.* at 61-67 (Appx1256-62).  Commerce's determination based on those findings is reasonable, consistent with the SAA, and consistent with its own decision in these circumvention inquiries to

place particular weight on the level of R&D. SAA at 893; IDM at 62 (Appx1257).

BYD and FPL contend that Commerce misapplied the "minor or insignificant" standard established by 19 U.S.C. § 1677j(b)(2). BYD Br. at 30-39; FPL Br. at 12-17. The only support that either party identifies for its position, however, are dictionary definitions of "minor" and "insignificant," along with a brief passage from the SAA that includes the term "screwdriver operation." *See* BYD Br. at 33-34 (citing SAA at 893-4). But none of these sources can supplant the analysis prescribed by Congress for evaluating whether the production process in a third country is minor.

The statute identifies the factors that Commerce shall take into account, and the SAA directs that "{n}o single factor will be controlling." SAA at 893. The fact that the SAA contains the term "screwdriver" operation, as an illustrative example, does not limit the statutory definition of "minor or insignificant." Rather, "the SAA's reference to "screwdriver assembly operations" plainly alludes to production operations in a third country that are 'minor or insignificant.'" *HLDS (B) Steel SDN BHD v. United States,* No. 21-00638, 2024 WL 244937, at *4 n.7 (Ct. Int'l Trade Jan. 23, 2024) (citing 19 U.S.C. § 1677j(b)(1)(C)). Commerce's role is to evaluate whether the respondents' production of solar cells in Cambodia is "minor or insignificant" under the section 1677j(b)(2) criteria. *Id.* at *4. Commerce did exactly that,

and because its decision is supported by substantial evidence, the Court

should sustain it.

III.   Commerce's Determination Not To Consider The Activities Of BYD's
       Unaffiliated Tollers Is Supported By Substantial Evidence

Commerce compared BYD's production facilities in Cambodia to those

of its Chinese affiliate in evaluating the investment, R&D, and production

facilities factors (19 U.S.C. § 1677j(b)(2)(A), (B), and (D)).  PDM at 14-15, 18-

19 (Appx1028-29, Appx1032-33); BYD Prelim. Analysis at 3-4 (Appx1002-03)

(unchanged in *Final Results*).  In doing so, Commerce considered the level

of investment, R&D and production facilities by BYD and did not

consider the activities of BYD's unaffiliated tollers.  IDM at 50-52 (Appx1245-

47).  And because BYD did not incur any investment, R&D expenses, or

maintain any production facilities in Cambodia, Commerce found that each of

those factors supported a finding that the production process in Cambodia

was minor or insignificant.  *Id.* at 61-67 (Appx1256-62).

Commerce's determination reflects the nature of the circumventing

behavior alleged by Auxin and investigated by Commerce.  Commerce

explained that the particular circumvention scenario alleged by Auxin

involved third country (Cambodian) companies relying on affiliated Chinese

input suppliers to evade the *Solar Orders*.  IDM at 25 (Appx1220) (citing

Circumvention Request at 1-2, 7 (Appx1409-10, Appx1415)).  BYD has no

17

production operations, R&D, or manufacturing equipment of its own in Cambodia. *Id.* at 51 (Appx1246) (citing BYD Preliminary Analysis Memo at 2 (Appx1001); BYD Initial QR Part II at 1-2, 17-19 (Appx8713-14, Appx8717-18); BYD Verification Report at 13 (Appx1175)). BYD also procures inputs, including solar wafers, from its Chinese affiliate. BYD Part II QR at 17 (Appx8717). It then acquires tolling (and other) services for the purpose of manufacturing solar products for export by BYD.

Indeed, BYD and FPL fail to explain why Commerce must treat tolling services acquired by a company with no manufacturing infrastructure in the third country any differently than the acquisition of goods and services by a respondent that has manufacturing infrastructure. Under BYD's and FPL's preferred methodology, Commerce would be required to assess the level of investment, level of R&D, and production facilities underpinning all goods and services acquired from unaffiliated sellers in the third country. Moreover, they do not contend that Commerce possesses such a practice. And in any event, goods and services acquired in the third-country are accounted for in the value-added factor, 19 U.S.C. § 1677j(b)(2)(E).

Therefore, Commerce reasonably did not consider the activities of BYD's unaffiliated tollers in analyzing those three factors. BYD purchases solar inputs from its Chinese affiliate and oversees the production of solar cells and modules from its wafers before exporting finished merchandise to

the United States. BYD's behavior is therefore reflective of the sort of circumventing behavior alleged by Auxin, in which Chinese solar producers spin off solar cell and module production to third countries.

In considering that fact pattern, Commerce determined to evaluate the section 1677j(b)(2) factors using a "comparative approach that accounts for the production activities of the upstream affiliates of the third country producers." IDM at 25 (Appx1220). BYD's tollers are *not affiliated* with BYD and its Chinese input supplier, so it would have been inconsistent with Commerce's methodological approach to consider the tollers' information in its analysis. And because BYD's tollers are unaffiliated with BYD or BYD's Chinese affiliate, their level of investment, R&D expenses, and production facilities are ultimately unrepresentative of whether BYD, as one of the largest exporters of solar cells from Cambodia, circumvented the *Solar Orders*.

BYD's contention that Commerce erred by factoring the ownership of BYD's tollers into the determination whether the processing in Cambodia was minor or insignificant is wrong. BYD Br. at 41-42. The statute expressly directs Commerce to consider whether the producer in a third country is related to the supplier of inputs in a country which is subject to an antidumping or countervailing duty order. 19 U.S.C. § 1677j(b)(3)(B); *see also* SAA at 894. This evinces congressional intent that Commerce consider

the identity of a producer (in this case, BYD in Cambodia–not BYD's

suppliers) and that producer's relationship with input providers from the

order country (BYD's Chinese affiliates).

Moreover, the SAA directs Commerce to consider the facts of a given

circumvention scenario when evaluating whether the production process in a

third country is minor.  SAA at 893.  Commerce found that the relationship

between third country exporters/producers and their Chinese affiliates was

relevant to its analysis and determined to apply a "comparative approach

that accounts for the production activities of the upstream affiliates of the

third country producers."  IDM at 25 (Appx1220).  Therefore, Commerce's

consideration of BYD's ownership is not only a reasonable exercise of its

discretion but is also supported by the plain language of the statute and the

SAA.

BYD also maintains that Commerce departed from its prior

determination in *SSSS from China*.  BYD Br. at 42-43 (citing *Stainless Steel*

*Sheet and Strip from the People's Republic of China*, 87 Fed. Reg. 56,626

(Dep't of Commerce Sept. 15, 2022) (prelim. circumvention det.), and

accompanying PDM (SSSS from China PDM).  That case is inapposite.  In

SSSS from China,, Commerce selected two companies–a producer, and its

trading company exporter–as respondents.  SSSS from China PDM at 10.

Commerce was able to consider both the information of the trading company

and its unaffiliated producer because both were mandatory respondents. IDM at 52 (Appx1247). Unlike the SSSS case, BYD's tollers were not selected as respondents to Commerce's inquiry because they were not among the largest exporters/producers of subject merchandise during the inquiry period. *See generally* RSM (Appx3952-59). Therefore, the facts in this case are different and SSSS from China is not analogous. IDM at 52 (Appx1247).

FPL similarly maintains that Commerce's treatment of BYD is inconsistent with its treatment of trading companies in antidumping and countervailing duty proceedings. FPL Br. at 22-23. But Commerce addressed this point, explaining that the purpose of a circumvention inquiry is distinct, and that in the context of a circumvention proceeding, it would be "unreasonable to use the investments/production facilities of {BYD}'s unaffiliated tollers as the basis for comparison in Cambodia when {BYD} contributed nothing to such investments/production facilities." IDM at 51 (Appx1246). Indeed, the question is whether BYD circumvented, not whether a toller dumped.

FPL further contends that it was arbitrary for Commerce to select BYD as a respondent, but not incorporate BYD's unaffiliated tollers into the 19 U.S.C. § 1677j(b)(2) analysis. FPL Br. at 24-25. FPL fails to consider, however, that Commerce is unaware of individual respondents' manufacturing processes at the time of respondent selection. Although

Commerce understood that BYD was a trading company and relied on tollers, Commerce would not have known any of the information used to evaluate the minor or insignificant factors, or even how it would evaluate those factors given the particular circumvention scenario posed by these inquiries.

Commerce selected the two largest exporters/producers of solar cells from Cambodia, which included BYD. RSM at 96-7 (Appx3957-58) (articulating Commerce's practice). Only in the *Preliminary Results*, published almost seven months later, did Commerce first determine that it would not consider BYD's unaffiliated tollers in its analysis of the § 1677(b)(2) factors. PDM at 15-19 (Appx1029-33). So even assuming for the sake of argument that Commerce should have selected BYD's tollers in the first instance, this would not have been an apparent issue to Commerce until the preliminary determination–at which time it was too late to identify new mandatory respondents and to solicit information from them.

Lastly, BYD contends that its unaffiliated tollers' data support its argument that Commerce erred in evaluating the section 1677j(b)(2) factors. BYD Br. at 44-47. The fact that BYD's *unaffiliated tollers* may have invested in, carried out R&D in, or established production facilities in Cambodia has no bearing on whether BYD circumvented the *Solar Orders*. And BYD's reliance on its suppliers' information lacks merit because it fails to establish

that the entire purpose of its tollers' facilities was to service BYD's

production of subject merchandise.

Accordingly, Commerce's determination not to factor BYD's unaffiliated

tollers into its evaluation of the level of BYD's investment, its level of R&D,

and the extent of its production facilities in Cambodia is supported by

substantial evidence and in accordance with law.

IV.    The Value Added In Cambodia By BYD's Tollers Was Small

Commerce calculated the value of processing in Cambodia by summing

the per-unit costs incurred by BYD for non-Chinese inputs, a per-unit

amount paid by BYD to the tollers, and any labor, overhead, selling, general,

and administrative expenses, and interest incurred by BYD, and divided that

sum by the per-unit average value of its U.S. sales during the period of the

inquiry.  PDM at 19 (Appx1033) (unchanged in *Final Results*); *see also* BYD

Prelim. Analysis Memo at 4 (Appx1003); Final Analysis Memorandum (P.R.

523/C.R. 268) at Attachment III (P.R. 524/C.R. 294) (excel spreadsheet).

Commerce calculated a value added in Cambodia for BYD and that this

amount supported a finding that the processing in Cambodia was minor.

BYD Prelim. Analysis Memo at 4 (Appx1003).

BYD contends that Commerce wrongly departed from past practice by

failing to consider qualitative factors as part of its evaluation of the value

added in the third country.  BYD Br. at 51-56 (citing *Hot-Rolled Lead and*

*Bismuth Carbon Steel Products from Germany and the United Kingdom*, 64

Fed. Reg. 40,336, 40,347 (Dep't Commerce Jul. 26, 1999) (final admin. det.);

*Certain Corrosion-Resistant Steel Products from Taiwan*, 84 Fed. Reg. 32,864

(Dep't Commerce July 10, 2019) (prelim. admin. det.), and accompanying

Issues and Decision Memorandum; *Small Diameter Graphic Electrodes from*

*the People's Republic of China*, 77 Fed. Reg. 33,405, 33,413 (Dep't of

Commerce Jun. 6, 2012) (prelim. admin. det.); *Certain Pasta from Italy*, 68

Fed. Reg. 46,571, 46,575 (Dep't Commerce Aug. 6, 2003) (final admin. det.)).

But the plain language of section 1677j(b)(2)(E), which provides that

Commerce shall consider "whether the value of the processing performed in

the foreign country represents a *small proportion* of the value of the

merchandise imported into the United States," envisions quantitative

analysis. (emphasis added). To that end, Commerce found that, in the

context of value added in the third country, "the word 'value' denotes

monetary value." IDM at 64 (Appx1259).

BYD maintains that Congress intended "a more qualitative focus on the

nature of the production process." BYD Br. at 52-54 (citing SAA at 893)

(quotations excluded). However, the "nature of the production process" is

separately accounted for in subparagraph 1677j(b)(2)(C). To evaluate the

nature of the production process under both 19 U.S.C. §§ 1677j(b)(2)(C) and

1677j(b)(2)(E) would be illogical. That would double-count the nature of the

production process within the totality of the factors. Of course, a statutory term should not "needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." *Nielsen v. Preap*, 586 U.S. 392, 139 S. Ct. 954, 969 (2019) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012)). And this Court has sustained Commerce's value-added methodology:

> Because {19 U.S.C. § 1677(b)} does not mandate the use of a particular formula, Commerce has the ability to choose how to calculate the value-added percentages as long as its chosen methodology is reasonable and Commerce explains its choice. Commerce is required neither to use a party's proffered and preferred methodology, nor to provide an explanation for a decision not to use an alternative methodology offered by a party.

*Al Ghurair I*, 536 F.Supp.3d at 1374. So, even if BYD's proposed methodology were permissible, absent clear statutory directive, Commerce's choice stands.

As for Commerce's past practice, so long as Commerce explains itself, it is not bound by its prior determinations. *Al Ghurair II*, 65 F.4th at 1360 (citing *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1089 (Fed. Cir. 2021); *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004)). With respect to the cases cited by BYD, Commerce explained that it had

> applied Congress's direction to focus more on the nature of the production process and less on value with respect to *the overall decision of whether processing is minor or insignificant* or the

> overall determination of whether circumvention is occurring and not its determination under {19 U.S.C. § 1677j(b)(2)(E)}.

IDM at 65 (Appx1260). In other words, the SAA requires Commerce to consider the nature of the production process only when assessing whether the production process *as a whole* is minor or insignificant. Commerce thus considered the nature of the production process separately from its evaluation of the value added. *Id.* at 63-67 (Appx1258-62).

Commerce's reasoning is consistent with the SAA. Although Commerce has acknowledged that "Congress directed the agency to focus more on the nature of the production process and less on the difference between the value of the subject merchandise and the value of the parts and components imported into the processing country{}," this must be understood within the context of the statute that pre-dated the SAA. That statute contained no provisions related to the nature of the production process, and instead directed Commerce to determine whether circumvention occurred based on the difference in value between exports to the U.S. and the cost of the inputs purchased from the order country. PL 100–418, Aug. 23, 1988, 102 Stat 1107 at § 1321 (1988 Statute).

Congress recognized that the "mechanical, quantitative approach" of the 1988 Statute did not address scenarios when minor assembly is done in a third country, but the difference in value between the value of inputs and the

value of the eventual export is not small. SAA at 893. The enactment of 19

U.S.C. §§ 1677j(b)(2)(A)-(D) resolved the issue with the 1988 statute, which

the SAA identified. Accordingly, the shift away from a "mechanical,

quantitative approach," as expressed by the SAA is not directed at the

current 19 U.S.C. § 1677j(b)(2)(E), and thus, Commerce's methodology is

consistent with congressional intent. IDM at 59 (Appx1254).

Lastly, BYD maintains that "Commerce's inquiry should have ended as

soon as it found that the value-added in Cambodia exceeded" some threshold

that was slightly below BYD's calculated value-added figure. BYD Br. at 36,

39. BYD provides no legal support for the notion that a small calculated

value cannot be indicative of circumvention. BYD adds that Commerce's

determination with respect to the value added in Cambodia is undermined by

prior administrative determinations. BYD Br. at 49-51 (citing

*Ferrovanadium and Nitrided Vanadium From the Russian Federation*, 77

Fed. Reg. 6,537, 6,539 (Dep't Commerce Feb. 8, 2012) (prelim. circumvention

det.); *Certain Tissue Paper Products from the People's Republic of China*, 73

Fed. Reg. 21,580, 21,585-86 (Dep't Commerce Apr. 22, 2008) (prelim.

circumvention det.); and *Hot-Rolled Lead from Germany*, 64 Fed. Reg. at

40,340). Commerce, however, is not bound by these determinations because

they do not involve the solar industry. *Al Ghurair II*, 65 F.4th at 1360. But

even if Commerce were bound by any of these decisions, only *Ferrovanadium*

*from Russia*, which involved unique product-specific circumstances that are not applicable in this case, arguably contradicts what Commerce did in this case.

*Tissue Paper from China* involved a figure that was ranged by plus or minus 10 percent. *Tissue Paper from China*, 73 Fed. Reg. at 21,585 n.8. So, even leaving aside the fact that *Tissue Paper from China* relates to a different product, it is unclear from the record whether Commerce's determination in that case contradicts Commerce's determination in this case because the cited values do not conclusively exceed the figure in this case. *See* BYD Br. at 50 (discussing confidential figure). Moreover, Commerce explained that "the statutory factor, section {1677j}(b)(2)(E) . . ., was inconclusive {in *Tissue Paper from China*}. Rather, in making the circumvention determination {in that case}, Commerce {had} relied on the four other statutory factors under section {1677j}(b)(2) . . ., which favored a finding of circumvention." IDM at 66 (Appx1261). So even if Commerce had departed from past practice (which it did not), it did so permissibly by explaining its decision. *Al Ghurair II*, 65 F.4th at 1360.

*Hot-Rolled Lead from Germany* did not clearly articulate whether a value added in the range of 10 to 29 percent was small, and in any case based its overall negative circumvention determination on factors separate from the

value added in the third country.  *Hot-Rolled Lead from Germany*, 64 Fed. Reg. at 40,342.

Only in *Ferrovanadium from Russia* did Commerce find that a value added lower than that which Commerce calculated for BYD was not small andin that case, Commerce recognized that its finding differed from other cases and was based on the high volatility of the price of ferrovanadium during the inquiry period.  *Ferrovanadium from Russia*, 77 Fed. Reg. at 6,538-40; *see also* IDM at 67 (Appx1262) (distinguishing value-added finding in this case from *Ferrovanadium from Russia*).  Therefore, BYD's arguments with respect to Commerce's value-added determination are without merit, and Commerce's determination should be sustained.

V.    BYD's Level Of Investment Was Minor

The statute directs Commerce, in determining whether the production process in a third country is minor, to consider the level of investment in the foreign country.  19 U.S.C. § 1677j(b)(2)(A).  Commerce evaluated the level of investment in Cambodia for BYD pursuant to the statute by comparing the total initial startup cost of BYD's affiliated Chinese producer to BYD's own investments in Cambodia.  BYD Prelim. Analysis at 3 (unchanged in *Final Results*).  Commerce found that BYD had no investment in Cambodia, and therefore that BYD's investment in Cambodia was minor compared to its affiliated Chinese producer, which did have initial startup costs.  *Id.*

Commerce's determination is supported by substantial evidence, and consistent with the statute.

BYD further asserts that Commerce erred by evaluating the level of investment on an absolute, rather than a per-unit, basis because Commerce "failed to take into account the vastly smaller market served by the Cambodian operations as compared to {BYD}'s Chinese affiliates." BYD Br. at 59-63; *see also* FPL Br. at 27-28. BYD's offered distinction is irrelevant because, even if Commerce were to account for the "vastly smaller market," *id.*, of BYD's Cambodian operation, BYD's total investment in Cambodia would still be *zero*. BYD fails to explain how, regardless of calculation methodology, the level of investment for a producer with no investment could be considered anything but minor.

And even if BYD had investment in Cambodia, Commerce correctly found that a per-unit comparison was unwarranted. Commerce explained that comparison on a per-unit basis does not account for the threshold investments necessary to achieve production of solar ingots and wafers. IDM at 18 (Appx1213). A per-unit basis also fails to account for the economies of scale realized in the Chinese market as a result of China's dominance of solar supply chains. *Id.* at 18-19 (Appx1213-14) (citing Auxin Investment Submission at Exhibit 1 at 17 and 24-27) (Appx16885, Appx16892-95). In other words, the fact that Chinese solar producers dominate global supply

chains—which means that those producers are more likely to have high levels of initial investment in absolute terms—should be reflected in Commerce's analysis, not disregarded. The fact that absolute levels of investment in Cambodia are lower than those in China is not distortive but is consistent with Commerce's determination to apply the section 1677j(b)(2) factors in a manner that accounts for the upstream affiliates of third-country producers. IDM at 25 (Appx1220). And because the statute does not speak to how Commerce should compare levels of investment, and because Commerce's determination to compare investment on an absolute basis is well-explained and supported by the record, BYD's argument is without merit. *See Al Ghurair I*, 536 F. Supp. 3d at 1370) (explaining that "{t}he statute does not provide for a specific minimum or maximum level of investment to qualify as minor or insignificant, so Commerce has the discretion to adapt to different factual circumstances to address circumvention.").

VI.  Commerce Lawfully Used Surrogate Values For Chinese Inputs

Pursuant to the statute, to find circumvention, Commerce must determine that "the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States." 19 U.S.C. § 1677j(b)(1)(D). Commerce used Malaysian prices as surrogate values for

Chinese inputs (with the exception of solar glass, for which Commerce used Romanian prices). PDM at 8 (Appx1022) (unchanged in *Final Results*).

This is consistent with its broader non-market economy (NME) methodology. China is a nonmarket economy country. Under 19 U.S.C. § 1677(18), "nonmarket economy country" "means any foreign country that {Commerce} determines does not operate on market principles of cost or pricing structures." And, for the purposes of 19 U.S.C. § 1677j(b)(1)(D), Commerce considers "value" to mean the cost of the input. As a result, Commerce turned to the text of 19 U.S.C. § 1677b(f)(1), which permits Commerce to use surrogate values to determine the cost of inputs in antidumping proceedings. IDM at 44-45 (Appx1239-40). Commerce, finding its NME practice in antidumping proceedings to be relevant for the purposes of circumvention inquiries, used surrogate values to calculate the value of Chinese inputs as a proportion of the overall price of BYD's exports. *Id.*

Using surrogate values to calculate the value of Chinese inputs makes perfect sense. By definition, nonmarket economy "prices" are not market based. 19 U.S.C. § 1677(18). And BYD merely took its affiliates' nonmarket inputs, hired Cambodian companies to conduct finishing operations, and then set market-based export prices from Cambodia to the United States for the subject merchandise. To use Chinese input prices based on *nonmarket principles* to determine what proportion of the United States *market price*

was derived from Chinese production would be irrational.  Given this

elemental understanding, Commerce's determination is consistent with the

statute and this Court's teaching.  *Al Ghurair I*, 536 F. Supp. 3d. at 1378;

*U.K. Carbon and Graphite Co., Ltd. v. United States*, 931 F. Supp. 2d 1322

(Ct. Int'l Trade 2013).

BYD nevertheless contends that Commerce should not have used

surrogate values for the proportion of the value of finished merchandise

produced in China.  BYD Br. at 63-69.  BYD's only support is the fact that

Cambodia is a market-economy country.  But the statute directs Commerce to

calculate the value of merchandise produced in "the foreign country to which

the antidumping duty order applies," 19 U.S.C. § 1677j(b)(1)(D), which is

China, not Cambodia.  China is a non-market economy country, therefore,

Commerce properly used a surrogate value methodology that it normally

applies with respect to non-market economy countries to carry out that

calculation, particularly when the statute does not define the term "value"

and does not direct Commerce how to carry out its calculation.  *Al Ghurair I*,

536 F. Supp. 3d. at 1378.  The Court should therefore follow its precedent and

sustain Commerce's determination to calculate the value of production in

China using surrogate values.

## VII. Commerce's Finding That Action Was Appropriate Under The Statute To Prevent Evasion Is Supported By Substantial Evidence

To include circumventing merchandise within the scope of an order, Commerce must determine that action is necessary to prevent "evasion." 19 U.S.C. § 1677j(b)(1)(E). Commerce found circumvention through Cambodia, finding that evidence pertaining to the 19 U.S.C. § 1677j(b)(3) factors indicated that circumvention was occurring and would continue to occur absent action to prevent circumvention. IDM at 76-77 (Appx1271-72). Commerce need not consider factors beyond those contained in 19 U.S.C. § 1677j(b)(3) before determining that the inclusion of circumventing merchandise within the scope of an order is appropriate. *HLDS Steel*, No. 21-00638, 2024 WL 244937, at *4. Commerce's determination is therefore based on record evidence and does not render "surplusage" the statutory requirement that Commerce determine that action be necessary to prevent evasion, as BYD claims. BYD Br. at 70-71.

BYD does do not dispute Commerce's finding, nor does it identify any deficiency in Commerce's analysis of the record evidence under paragraph 1677j(b)(3). Almost all of BYD's argument with respect to this factor pertains to Commerce's prior determinations that the country of origin of a solar cell is based on the country in which the p/n junction is formed. BYD Br. at 72-75. Absent any authority, BYD maintains that, because Commerce has found

that the formation of the p/n junction is determinative of the country of origin

of subject merchandise under the *Solar Orders*, Commerce is precluded from

including Cambodia-origin solar cells in the scope of the *Solar Orders*.

BYD's contention cannot overcome the Federal Circuit's explicit

mandate that section "1677j can capture merchandise that is substantially

transformed in third countries, which further implies that § 1677j and the

substantial transformation analysis are not coextensive." *Bell Supply Co.,*

*LLC v. United States*, 888 F.3d 1222, 1231 (Fed. Cir. 2018) (citing Conference

Report accompanying the Omnibus Trade and Competitiveness Act of 1988,

Pub. L. No. 100-418, 102 Stat. 1107 (1988); SAA at 893).  Accordingly,

inclusion of cells that are substantially transformed in Cambodia but are

nonetheless circumventing is entirely lawful.

Finally, BYD's appeals to matters of cost and public policy lack merit.

BYD Br. at 71-72.  BYD implies that Commerce should augment the statute

by conducting an analysis to determine the overall cost of its affirmative

circumvention finding.  But the statute requires Commerce to "determine{}

that action is appropriate under this paragraph to prevent evasion" of an

order.  19 U.S.C. § 1677j(b)(3).  "{T}he words of a statute must be read in their

context and with a view to their place in the overall statutory scheme." *Food*

*& Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133

(2000).  BYD, by reading the statutory term "appropriate" out of context,

would have this Court impose a requirement on Commerce that is not only burdensome but would also potentially undermine the efficacy of the circumvention statute.  For the same reason, BYD's reference to *Proclamation 10414*, which declares a national energy capacity emergency and directs Commerce to waive collection of antidumping and countervailing duties on solar cells from countries including Cambodia, is unavailing.  BYD Br. at 72 (citing *Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules From Southeast Asia*, 87 Fed. Reg. 35,067 (June 9, 2022)).  Whether the President deemed the waiver of duties on circumventing merchandise to be necessary to relieving the energy emergency is not relevant to Commerce's mandate under the statute, which is to determine whether an affirmative finding is appropriate to prevent evasion of the *Solar Orders*.  Commerce, taking the section 1677j(b)(3) factors into consideration, found that an affirmative circumvention finding was appropriate.  And in any event, *Proclamation 10414* expired by its own terms.  87 Fed. Reg. at 35,068.  In conclusion, Commerce's circumvention determination is supported by substantial evidence and in accordance with by law.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain the

*Final Determination* and enter judgment for the United States.

<div style="margin-left: 40%;">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/  REGINALD T. BLADES, Jr.
Assistant Director

</div>

| OF COUNSEL: | /s/ STEPHEN C. TOSINI |
|---|---|
| Spencer C. Neff | Senior Trial Counsel |
| Attorney | Department of Justice |
| Office of Chief Counsel for | Civil Division |
|   Trade Enforcement and | Commercial Litigation Branch |
|   Compliance | P.O. Box 480, Ben Franklin Station |
| Department of Commerce | Washington, D.C. 20044 |
| | Tel.: (202) 616-5196 |
| | Email:  stephen.tosini@usdoj.gov |
| | |
| October 29, 2024 | Attorneys for Defendant |

## CERTIFICATION OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 7,764 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Stephen C. Tosini